670 A.2d 629

In re **PETITION TO CONTEST** the **GENERAL ELECTION FOR DISTRICT JUSTICE IN JUDICIAL DISTRICT 36–3–03 NUNC PRO TUNC (Two Cases).**

Appeal of Joseph ZUPSIC.

Appeal of Delores A. LAUGHLIN.

Supreme Court of Pennsylvania.

Argued Sept. 19, 1994.

Decided Jan. 22, 1996.

218

John P. Dohanich, Rowley, Smith & Lewis, P.C., Ambridge, for Appellant at No. 23. J. Philip Colavincenzo, Beaver, for Appellant at No. 33.

J. Philip Colavincenzo, Beaver, for Delores A. Laughlin.

John P. Dohanich, Rowley, Smith & Lewis, P.C., Ambridge for Joseph Zupsic.

David M. Fouse and Mary L. David, Beaver County Law Department, for Bureau of Elections.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

NIX, Chief Justice.

This matter involves consolidated appeals by Joseph Zupsic and Delores A. Laughlin from an Order of the Court of Common Pleas of Beaver County setting aside the election conducted on November 2, 1993, for the office of District Justice for Judicial District 36–3–03.[1] While the initial vote

1. In 23 W.D.Appeal Docket 1994, Appeal of Joseph Zupsic, probable jurisdiction was noted citing *In re Reading School Board Election*, 535 Pa. 32, 634 A.2d 170 (1993). However, as Laughlin contended in her brief in opposition to the Supreme Court's jurisdiction, this matter should have been appealed to the Commonwealth Court pursuant to 42 Pa.C.S. § 762(a)(4)(i)(C). That section, in pertinent part, reads:

 (a) **General Rule.**—Except as provided in subsection (b), the Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in the following cases:
 . . . .
 (4) Local government civil and criminal matters.—
 (i) All actions or proceedings arising under ... or where is drawn into question the application, interpretation or enforcement of any:
 . . . .
 (C) statute relating to elections, campaign financing or other election procedures.
 42 Pa.C.S. § 762(a)(4)(i)(C). Although our Court had previously entertained appeals from the courts of common pleas in election matters, *see, e.g., Jones Election Contest Case*, 376 Pa. 456, 103 A.2d 652 (1954), jurisdiction over such appeals was given to the Commonwealth Court when that court was created in 1970. Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673 No. 223, art. IV, § 402 (codified as amended at 42 Pa.C.S. § 762); *see also* Olasz v. Wolosik, No. 46 W.D.Appeal Docket 1995.
 However, we will maintain jurisdiction over these two appeals in order to conserve judicial resources and speed the subsequent retrial. In No. 33 W.D.Appeal Docket 1994, Appeal of Delores Laughlin, this Court maintains jurisdiction pursuant to 42 Pa.C.S. § 704(a). Section 704(a) provides that "[t]he failure of an appellee to file an objection to the jurisdiction of an appellate court ... shall, unless the appellate court otherwise orders, operate to perfect the appellate jurisdiction of such appellate court...." In this appeal, Appellee Zupsic did not object to the jurisdiction of this Court. However, as we noted above, in No. 23 W.D.Appeal Docket 1994, Appeal of Joseph Zupsic, Appellee Laughlin argued that jurisdiction was in the Commonwealth Court, not

tabulation showed Zupsic the winner of the district justice race by thirty-six votes, a hand recount resulted in a swing of eighty-two votes in Laughlin's favor, thus making her the winner by thirty-six votes. The lower court concluded that in all probability, a sufficient number of ballots were altered between the time of the initial tabulation and the recount so as to change the outcome of the election. *In re Petition to Contest the General Election for District Justice in Judicial District 36–3–03 Nunc Pro Tunc*, No. 10051 of 1994, slip order at 4–5, finding of Fact No. 11 (C.P. Beaver County Apr. 8, 1994) [hereinafter *Petition I* ]. Further, the court determined that, since it was "impossible to accurately strike all the altered ballots so that the results of the election can be reached," setting aside the election was the appropriate remedy. *Id.*, slip order at 5, Finding of Fact No. 12.

Zupsic contends that the lower court correctly determined that tampering occurred; however, he maintains that the court should have awarded the election to him based on the initial tabulation rather than invalidating it. In the alternative, he claims that the court should have stricken the results from the five districts in which the alterations were concentrated, which would also result in his winning the election.

Laughlin's primary contentions are that the lower court erred in (1) allowing Zupsic to file this election contest nunc pro tunc; and (2) determining, by clear and convincing evidence, that tampering in fact occurred. If, however, this Court rejects these contentions, Laughlin also argues that the lower court erred in invalidating the election rather than making specific dispositions of those ballots subject to tampering. Because we find that the lower court's Findings of Fact are insufficient for us to determine whether invalidation of the election was an appropriate remedy, we reverse the Order of the court of common pleas and remand for proceedings consistent with this opinion.

in this Court. Thus, in No. 23 W.D.Appeal Docket 1994, this Court maintains jurisdiction pursuant to 42 Pa.C.S. § 726. *See Commonwealth v. Martorano*, 535 Pa. 178, 188 n. 6, 634 A.2d 1063, 1067 n. 6 (1993), and *Commonwealth v. Lang*, 517 Pa. 390, 395 n. 1, 537 A.2d 1361, 1363–64 n. 1 (1988).

On November 2, 1993, among numerous other state and local races, a general election was conducted for the office of District Justice in Judicial District 36-3-03, which spans the southern and central portions of Beaver County. Zupsic's and Laughlin's names appeared on the ballot as the respective nominees of the Democratic and Republican parties for the office. In Beaver County, the voters record their votes on paper ballots with graphite marking equipment. These votes are then tabulated by approved automatic tabulation machines. Prior to the election, Beaver County's four machines were tested and found to be counting accurately. *Petition I*, slip order at 3, Finding of Fact No. 2.

At the close of the polls on November 2, Beaver County's ballot boxes were returned to the Beaver County Courthouse and delivered to the room that houses the tabulation machines. Record at 239a. Each box was delivered sealed by a red numbered seal, which number was recorded by the local precinct. Record at 247a. Additionally, each box was locked with a padlock. Record at 242a. The padlocks on all 156 ballot boxes are identical, and approximately 160-170 keys exist for the boxes. Record at 242a, 405a. Any one of these keys can open any of the ballot boxes. *In re Petition to Contest the General Election for District Justice in Judicial District 36-3-03 Nunc Pro Tunc*, No. 10051 of 1994, slip op. at 3 (C.P. Beaver County May 5, 1994) [hereinafter *Petition II* ].

After the delivery of the boxes was completed, officials of the Bureau of Elections unlocked the boxes and removed the red seals. Record at 242a. The ballots were then run through the tabulating machines, after which the ballots were placed back into their respective ballot boxes. Record at 245a-46a. The boxes were then each relocked with a padlock and marked with a new seal; however, the numbers of the new seals were not recorded at that time. Record at 248a; *Petition II*, slip op. at 2-3. Election officials stored the boxes in the tabulation room, and three people had keys to the room. Record at 411a; *Petition II*, slip op. at 3.

On November 5, 1993, three days after the election, the ballot boxes were again opened by the Return and Write-in

Boards to audit the voter tallies and count the write-in votes. Record at 250a. These boards also made the first record of the seals that had been placed on the ballot boxes after the ballots had been tabulated by machine. Record at 254a. Thus, for a period of two to three days, the numbers of the seals on the ballot boxes went unrecorded.

After the Return and Write-in Boards completed their duties, Zupsic was awarded a total of 3,783 votes and Laughlin a total of 3,747 votes, making Zupsic the apparent winner of the district justice race by thirty-six votes. *Petition I*, slip order at 1. However, on December 1, 1993, twenty-nine days after the election, Laughlin filed Petitions to Open Ballot Boxes and Recount Votes for fourteen of the twenty-two ballot boxes in Judicial District 36–3–03.[2] On December 8 and 9, 1993, the Recount Board tabulated the ballots by hand, awarding Laughlin 3,793 votes to Zupsic's 3,747. Thus, the recount resulted in a swing of eighty-two votes, forty-six gained by Laughlin, and thirty-six lost by Zupsic. *Id.* at 2. During this recount, Zupsic challenged sixty-two ballots, while Laughlin challenged an additional thirteen. Record at 285a.

Zupsic then filed Petitions to Open Ballot Boxes and Recount Votes on December 17, 1993, for the remaining precincts in Judicial District 36–3–03.[3] Although these petitions are not part of the record in this matter, Zupsic's brief filed with this Court states that his petitions alleged substantial fraud or error in computing the votes or in marking the ballots not manifest on the general return. Brief for Appellant Zupsic at 11. This recount was conducted on December 20, 1993, and resulted in each candidate gaining only one vote apiece. Thus, after the second recount, the totals were 3,794 votes for Laughlin and 3,748 votes for Zupsic. *Petition I*, slip order at 2. During this recount, Zupsic challenged seven ballots, and Laughlin challenged an additional five. Record at 288a.

**2.** These districts were as follows: Center Township 1, 2 and 4–8; Greene Township; Monaca Borough 1–2; Potter Township; Raccoon Township 1–2; and Shippingport Borough.

**3.** These districts are Center Township 3; Georgetown Borough; Hookstown Borough; and Monaca Borough 3, 4–1, 4–2, and 5.

The Election Board also conducted a second machine count on January 5, 1994. Record at 290a–91a. While the Board attempted to duplicate the original machine run, this was not possible because one of the four machines used on election night was not operating properly on January 5. Record at 293a. Thus, the ballots originally run through that machine. were run through a different machine. Nonetheless, the January 5 machine count was nearly identical to the result obtained by the recounts, with Laughlin receiving 3,792 votes to Zupsic's 3,750. Record at 294a. This machine run tabulated votes for all offices on the ballot. Zupsic Exhibit No. 7.

On January 10, 1994, more than two months after the election, Zupsic filed a Petition to Contest the General Election Nunc Pro Tunc with the Beaver County Court of Common Pleas. Although 25 P.S. § 3456 provides that election contests for district justice races must be filed within twenty days of the election,[4] Zupsic claimed that he was entitled to proceed with his petition because he was unaware of any fraud or irregularities until he learned the results of the January 5 machine tabulation.

The court of common pleas then issued a rule upon Laughlin and the Beaver County Board of Elections[5] to show cause why the relief requested by Zupsic should not be granted. After Laughlin and the Board filed answers, the court made the rule absolute on February 3, 1994, and granted Zupsic leave to contest the election. Hearings on the petition were held on February 28, 1994, and March 11, 1994.[6]

**4.** Section 3456 provides that election contests of the second through fifth classes must be filed within twenty days of a primary or election. District justice races are contests of the fifth class pursuant to 25 P.S. § 3291.

**5.** The court of common pleas concluded that the county had standing to participate in the election contest because Zupsic requested that the Board of Elections conduct a new election and "the integrity of the county's election procedures was at issue." *Petition I,* slip order at 2 n. 4.

**6.** A third hearing had been conducted on January 10, 1994, concerning Zupsic's appeal from the final determinations made by the Recount Board in the recount proceedings. Because of the court's disposition of the matter, it did not address Zupsic's appeals.

By Order dated April 8, 1994, the court ordered that the challenged election be set aside. *Petition I.* In support of its action, the court made the following Findings of Fact, *inter alia:*

9. Sometime between election night and the completion of the work of the Return and Write-in Boards, which commenced on November 5, 1993, a person or persons, presently unknown, gained access to and opened some of the ballot boxes from some of the precincts within Judicial District 36–3–03.

10. After securing access to the ballot boxes, the unknown person or persons altered many of the ballots cast by the voters with respect to the District Justice Office in Judicial District 36–3–03 by placing a mark in the oval designated for Laughlin on the ballots.[7]

11. In all probability, a sufficient number of ballots were altered ... so as to change the outcome of the election for that office.

12. It is impossible to accurately strike all the altered ballots so that the result of the election can be reached by ascertaining the honest intent of the voters without disenfranchising the voters who cast the ballots which were altered.

*Petition I,* slip order at 9–12.

Based on these findings, the court then made the following Conclusions of Law:

3. A substantial number of ballots were altered by a person or persons other than the voter in the election for the office of District Justice in Judicial District 36–3–03.

4. The number of ballots altered by an unknown person or persons cannot be ascertained with reasonable accuracy; the correctness of the result of the election cannot be determined.

7. A footnote inserted at this point in the court's findings states that "of all the many altered ballots, only one contained a similar mark in the oval opposite Zupsic's name."

5. Should any of the altered ballots be stricken, the rights of the voters who cast those ballots would be prejudiced through no fault of their own. They would be disenfranchised.

*Petition I,* slip order at 5. Therefore, the court concluded that the election should be set aside and a special election conducted to ascertain the true intent of the voters.

Laughlin then filed her Notice of Appeal from the Order of the lower court to the Commonwealth Court on April 15, 1994, while Zupsic filed his Notice of Appeal with this Court on April 18, 1994. By Order dated May 2, 1994, we noted probable jurisdiction over Zupsic's appeal, and on May 4, 1994, the Commonwealth Court transferred the Laughlin appeal to this Court. On May 5, 1994, the court of common pleas filed an opinion in this matter pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 1925(a), to "more fully explain" why it set aside the election. *Petition II.* In this opinion, the court noted that, although the voting machines operated properly on both election night and on January 5, there were substantial differences in the vote totals for the two candidates. *Petition II,* slip op. at 1. Further, most of the significant differences occurred in five specific polling places and only within the Zupsic–Laughlin race. *Id.*

More specifically, the court noted that both the undervote and overvote totals recorded by the machines changed in Laughlin's favor. *Id.* at 1–2. An overvote occurs when the elector votes for more candidates for a given office than are to be elected, while an undervote occurs when the elector votes for fewer candidates than are to be elected. In the present case, the January 5 machine count showed that the number of overvotes increased (such that votes previously counted for Zupsic were now considered void), while the number of undervotes decreased (such that ballots previously counted for neither candidate were now counted for Laughlin). *Id.*

The court explained that the increase in overvotes was attributable to "a number of ... altered marks" that had been placed next to Laughlin's name on ballots where Zupsic's oval

was completely filled. *Id.* Likewise, the number of under-votes increased because "a number of the altered marks" had been placed next to Laughlin's name where the ballot previously bore no marks for either candidate. *Id.* Additionally, the court noted that the testimony of five voters who maintained that they did not place a mark in the oval for Laughlin even though their ballots had such marks. *Id.* at 3.

Further, the court found "overwhelming" evidence that more than five ballots were altered, noting that forty-five of the eighty-seven contested ballots had marks for Laughlin that were "substantially inconsistent" with most other marks on the ballot. *Id.* at 3, 8. However, the court did not identify which forty-five ballots these were. Also, while the court concluded that at least two persons did the tampering based on the types of marks made, the court did not explain what made the marks for Laughlin "inconsistent." *Id.* at 6–7.

Regarding how the ballots were altered, the court concluded that the Board of Elections had not adequately secured the ballot boxes because the seals placed on the ballots after the election night machine count were not recorded until the Recount and Write-in Boards had completed their work. *Id.* at 2–3. Further, the court noted that although each ballot box had been padlocked during this period, "numerous" keys for the padlocks had been distributed on election day, and any one key could open all the ballot boxes. *Id.* at 3. Also, even though the ballot boxes had been stored in a locked room during this period, more than one person had a key to the room. *Id.* Therefore, the court concluded that someone must have gained undetected access to the ballot boxes and made the alterations before the boards commenced their work. *Id.*

The court then noted that Laughlin was the winner in nine of the fourteen precincts she petitioned to open for a recount. *Id.* The court observed that

[i]t is most unusual for a candidate's supporters to ask for a recount of votes in a precinct won by the candidate. This is especially so when the victory is by a wide margin as it was

in some cases here. One reason for doing so is the certainty of securing even more votes on a recount.

*Id.*

In addressing its decision to set aside the election, the court recognized that, unless it is impossible to separate fraudulent votes from lawful votes, only the fraudulent votes should be stricken. *Id.* at 5. The court noted, however, that it was not able "to determine with certainty all the ballots that had been altered." *Id.* Further, "[a]ssuming [that] it was possible to determine all the ballots that had been altered, the voters who cast those ballots would be disenfranchised from their choice of District Justice through no fault of their own." *Id.* Therefore, "[t]he only way [the court] could assure the integrity of the electoral process and thereby promote confidence in the citizens of Judicial District 36–0–03 [sic] was to order another election." *Id.*

██ Finally, the court addressed the various remaining matters raised by Laughlin and Zupsic in their appeals. Regarding the allowance of Zupsic's appeal nunc pro tunc, the court acknowledged that 25 P.S. § 3456 requires that election contests be filed within twenty days of an election. However, nunc pro tunc relief is appropriate where a breakdown in the administrative operations of the Election Board occurs. *Id.* at 7 (citing *Appeal of Orsatti,* 143 Pa.Commw. 12, 598 A.2d 1341, *appeal denied,* 529 Pa. 637, 600 A.2d 956 (1991)). Here, the court found that Zupsic's petition sufficiently alleged an administrative breakdown—namely, ballot tampering while the ballots were in the custody of the Board of Elections.

Turning to the testimony of the five voters, the court noted that dictum in *Orsatti* provides that a voter may not waive his right to secrecy in voting conferred by Article VII, § 4 of the Pennsylvania Constitution. However, the court added that *Orsatti* based this observation on language from *Thomas A. Crowley Election Contest,* 57 Dauphin Co.Rep. 120 (1945), which also provides:

> We are not prepared to state nor called upon to say that there are no circumstances under which a legal voter will be

permitted to take the witness stand on his own volition and testify how he voted. There may be circumstances where it is proper. . . . But, . . . where it is possible to determine from the ballots what the vote of the district was, and there is no proof of fraud, we have no authority to accept the oral testimony of the voter as to his vote. . . .

*Petition II,* slip op. at 9 (citing *Thomas A. Crowley Election Contest,* 57 Dauphin Co.Rep. 120 (1945)).

While the court recognized that voters should never be compelled to divulge their votes against their will,

where a voter's ballot, properly cast, has been altered so as to either void the vote or change the ballot from a vote for the candidate of the voter's choice to the other candidate, the voter should have the right to voluntarily appear and testify. How else can the voter protect the sanctity of his of her ballot?

*Petition II,* slip op. at 9.

Regarding Laughlin's claim that the court should have disqualified the Beaver County District Attorney from investigating the election because she openly supported Zupsic during the campaign, the court found no authority for such disqualification. Further, the court noted that, even if the claimed conflict of interest affected any testimony, such conflict would go to weight and not admissibility. *Id.* at 9–10.

Concerning Zupsic's only complaint, that the court should have awarded the election to him, the court first noted that Zupsic had not made such a request in his Petition's prayer for relief. Second, the court noted that it was unable to conclude with reasonable certainty that a sufficient number of ballots were changed to have altered the election's outcome. *Id.* at 10.

■ We must begin with whether the lower court erred in allowing Zupsic to file his petition nunc pro tunc since the timeliness of a petition affects the court's jurisdiction. *See Orsatti,* 143 Pa.Commw. at 15, 598 A.2d at 1342. Laughlin first contends that since petitions for district justice contests must be filed within twenty days of an election, Zupsic's

Petition to Contest should have been filed no later than November 22, 1993. However, where a petitioner does not learn of a problem with the election until the filing period has expired and his ignorance is not due to any "fault or dereliction" on his part, this Court has allowed the petitioner to seek relief nunc pro tunc. *See e.g., Field Election Contest Case,* 375 Pa. 276, 99 A.2d 867 (1953) (petitioner unaware that election officials misspelled his name on return sheet transmitted to county board); *Koch Election Contest Case,* 351 Pa. 544, 41 A.2d 657 (1945) (petitioner unaware that election officials erred in transferring voting results from tally sheet to return sheets). Here, absolutely no evidence has been presented to show that Zupsic had any reason to suspect a problem with the election until Laughlin filed her Petitions to Open Ballot Boxes and Recount Votes on December 1, 1993, well past the deadline in section 3456. Therefore, Zupsic's Petition to Contest is not barred by the expiration of the twenty-day period.

■ Laughlin next contends that, even if Zupsic was not required to file his Petition to Contest by November 22, he still should have filed within twenty days of December 9, 1993, the date on which the recount Laughlin requested was completed. According to Laughlin, since Zupsic was present for this recount and it revealed significant changes from the machine tabulation on election night, Zupsic should have been well aware of a problem with the election results no later than the 9th. Thus, it was inexcusable for him to wait another month before filing his petition.

■ While we find some merit in Laughlin's position,[8] we cannot conclude from the record that it was inexcusable for Zupsic to wait until January 10, 1994, to file his Petition to Contest. Rather than imposing a new twenty-day limit on the petitioner, this Court has evaluated the timing of nunc pro

8. We note that while Zupsic claimed in his Petition to Contest that he was unaware of any fraud until he learned of the results of the second machine count on January 5, 1994, he admits in his Brief that his Petitions to Recount filed on December 17, 1993, alleged "substantial fraud or error in computing the votes or in marking the ballots not manifest on the general return."

tunc petitions by considering whether the petitioner is guilty of laches. *See, e.g., Field,* 375 Pa. at 278, 99 A.2d at 867 (petitioner should have been allowed to proceed nunc pro tunc because he was not guilty of laches). For laches to apply, there must be a lack of due diligence in pursuing a cause of action and resulting prejudice to the other party. *Brodt v. Brown,* 404 Pa. 391, 172 A.2d 152 (1961).

Here, while at least some evidence indicates that Zupsic had reason to suspect fraud well before January 5, 1994, the record does not indicate that Laughlin was prejudiced by any delay. Between December 9 and January 10, Zupsic filed his own petitions for a recount, and the Board of Elections completed a second machine count. Therefore, Laughlin had no reason to believe that the election was settled in her favor.

■ A petitioner generally cannot delay contesting an election while recounts are being completed. *See Horsham Township Election Case,* 356 Pa. 60, 51 A.2d 692 (1947). However, we are hesitant to deny a petitioner the right to contest an election where an initial problem with the election is raised by his opponent after the time to contest has expired. Here, although Zupsic arguably had reason to file his Petition to Contest earlier than January 10, no evidence exists to indicate that Laughlin was prejudiced by any delay. Therefore, the Petition to Contest is not barred by the fact that it was not filed until January 10.

■ Finally, Laughlin argues that, regardless of when Zupsic's Petition to Contest was filed, he still was not entitled to proceed nunc pro tunc because the evidence did not establish that any supposed tampering was the product of the Election Board or the court. In support of her position, Laughlin cites *Orsatti,* which determined that a petitioner should not be allowed to proceed nunc pro tunc "absent fraud or a breakdown *in the court's operation* due to a default of its officers." 143 Pa.Commw. at 15, 598 A.2d at 1342; *see also In re General Election for Township Supervisor,* 152 Pa.Commw. 590, 620 A.2d 565 (1993) (indicating that allegation of error by Election Board would also be sufficient).

We agree with the court of common pleas that Zupsic's Petition to Contest sufficiently alleged a breakdown in the operation of the Beaver County Board of Elections. While Zupsic did not specifically state that the Board of Elections was derelict in its duties, he did specifically allege that fraud in the election occurred between the first machine count on November 2 and the second machine count on January 5. Since the ballots were in the exclusive control of the Board of Elections and/or the court during that time, the only logical conclusion to be reached from the Petition is that any alleged ballot tampering occurred while the ballots should have been secured by the Board of Elections.

Laughlin equates the ballot tampering alleged here with the forgery of signatures on absentee ballots alleged in *Orsatti*, which the Commonwealth Court found not to constitute an administrative breakdown. However, in *Orsatti*, there was no indication that the ballots were under the Election Board's control at the time the alleged forgeries occurred. In contrast, the failure to adequately secure ballot boxes alleged here qualifies as a breakdown in the Board of Elections' operation due to some failure on the part of its officers. Therefore, Zupsic's Petition to Contest satisfies the *Orsatti* standard.

In addition to the nunc pro tunc arguments, Laughlin contends that the facts do not support the court of common pleas' conclusion that tampering in fact occurred. This Court is bound by the trial court's findings of fact unless those findings are not based on competent evidence. *Thatcher's Drug Store v. Consolidated Supermarkets*, 535 Pa. 469, 477, 636 A.2d 156, 160 (1994). Our review of the record in this matter convinces us that there was more than competent evidence to support the trial court's finding of tampering.

The court of common pleas based its finding of tampering on the following evidence:

(1) the voting tabulation machines were operating accurately on both election night and when the second machine

count was taken on January 5, 1994, *Petition I,* Finding of Fact No. 2; *Petition II,* slip op. at 1;

(2) the results of the two machine tabulations revealed "substantial" differences in the vote totals for each candidate, *Petition II,* slip op. at 1;

(3) these differences occurred "for the most part" within the District Justice race and in five particular precincts within that race, *id.;*

(4) "substantial" differences occurred in the overvote totals between the two machine counts because "a number of altered marks had been placed next to Laughlin's name and the oval alongside Zupsic's name was completely filled," *id.* at 2;

(5) "substantial" differences also occurred in the undervote totals between the two machine counts "because a number of altered marks were placed alongside Laughlin's name and the oval alongside Zupsic's name had not been filled," *id.;*

(6) the changes in the undervote and overvote totals were favorable to Laughlin, *id.;*

(7) the ballot boxes were left unsecured for a period of time because the numbered seals on the boxes were not recorded until the Write-in and Return Boards completed their work, *id.* at 2–3;

(8) "numerous" keys had been distributed to the ballot boxes on Election Day, and any one key could open all the boxes, *id.* at 3;

(9) "more than one person" had a key to the room where the ballot boxes were stored after the election, *id.;*

(10) forty-five of the eighty-seven ballots contested by Laughlin and Zupsic had "substantially inconsistent" marks from most other marks on the ballot, including situations where no marks existed for any other individual candidates either anywhere on the ballot or anywhere on the reverse side of the ballot, where the District Justice candidates were listed, *id.;*

(11) five voters testified that they did not place a mark on their ballots for Laughlin, even though their ballots indicated otherwise, *id.;* and

(12) Laughlin was the winner on election night of nine of the fourteen precincts her petitions sought to be recounted, some by wide margins. *Id.*

There are certainly instances where the court could have been more precise in its factual findings—for example, detailing the initial vote tabulation, identifying the five precincts involved, indicating the number of keys distributed, and detailing the nature of the altered marks. However, our review of the record reveals substantial evidence to support the court's findings that ballot tampering occurred to at least some degree. This is so even if one sets aside the findings detailed in paragraphs (11) and (12) above, which concern matters that Laughlin challenges and which we discuss below.

█ However, we agree with Laughlin's third contention that the court of common pleas' failure to make specific findings regarding the degree of tampering makes it impossible for this Court to review whether setting aside the election was the appropriate remedy in this case. For the same reasons, we also find it impossible to evaluate Zupsic's claim that the court should have awarded the election to him based on the first machine count, as audited, together with the write-in votes.

█ To achieve the goal of enfranchisement wherever possible, this Court has consistently recognized that "the power to throw out a ballot for minor irregularities should be sparingly used." *In re Petitions to Open Ballot Boxes,* 410 Pa. 62, 65, 188 A.2d 254, 256 (1963). Even the mere casting of fraudulent votes is not sufficient to throw out a return. *See In re West Mahanoy Township's Contested Election,* 258 Pa. 176, 179, 101 A. 946, 946 (1917). Instead, if it is at all possible, the fraudulent votes should be purged and the remaining votes retained. *See id.; see also In re Bright's Contested Election,* 292 Pa. 389, 393, 141 A. 254, 255 (1928).

It is only when an election has been characterized by such fraud or intimidation or other unlawful conduct as to make the election a mere travesty or when the ballots or voting machines ... are in such condition that it is impossible to ascertain from an inspection of them the will of the voters that a court will reject the entire returns from a district and annul the election.

*Winograd v. Coombs,* 342 Pa. 268, 271–72, 20 A.2d 315, 316 (1941).

In the present case, the court of common pleas set aside the election because it was "impossible to accurately strike all the altered ballots so the result of the election can be reached by ascertaining the honest intent of the voters without disenfranchising the voters who cast ballots which were altered." *Petition I,* Finding of Fact No. 12. Therefore, the court claimed that it could not determine that the alterations definitely changed the election's outcome; instead, at best, it could only conclude that the alteration "probably" affected the outcome. *Petition II,* slip op. at 10.

However, the mere possibility that the alteration of ballots affected the outcome of the election is clearly insufficient to set aside an election and disenfranchise the vast majority of voters whose ballots remained unaffected by the tampering. Instead, this Court's previous rulings required the lower court to specify which ballots it concluded had been altered and to explain the reasons for its conclusions. Likewise, the lower court should have identified the ballots that it was unable to classify as either altered or unaltered, and again to explain the reasons for its conclusions. Without such findings, it is impossible for this Court to make a review of the ballots to determine whether the election should have been awarded to one of the candidates rather than set it aside in its entirety.

We understand the lower court's concern that, if it were to purge all of the altered ballots, the result would be to disenfranchise voters whose ballots were tainted through no fault of their own. The court errs, though, in concluding that the appropriate and only course would be to disregard the

altered ballots. Where evidence establishes that ballots were altered between the time of initial tabulation and a recount, discarding the votes is "wholly untenable." *See In re Opening of Ballot Box,* 344 Pa. 350, 355, 25 A.2d 330, 333 (1942). Instead, where

> a discrepancy result[s] from fraudulent tampering with the ballot boxes and their contents, since the official canvass of the votes, ... the court [is] fully justified in directing that the fraudulently altered ballots be counted for ... the candidate for whom the evidence shows they must necessarily have been counted by the election officials, and it would ... [commit] grievous error [to do] otherwise.

*Id.* Therefore, far from striking the altered ballots, the court of common pleas has the duty to enfranchise legitimate voters by awarding those ballots to the intended recipient if that recipient can be determined by clear and convincing evidence.[9]

 Finally, we turn to Laughlin's remaining claims of error. First, and most significantly, she claims that the lower court erred in admitting the voluntary testimony of five voters in the District Justice election. These voters, who could identify their ballots because they had designated themselves as write-in candidates for various offices, all testified that marks for Laughlin on their ballots were not made by them. Laughlin maintains that this testimony should not have been allowed because Article VII, Section 4 of the Pennsylvania Constitution provides for "secrecy in voting."

Judge Woodside's opinion in *Thomas A. Crowley Election Contest,* 57 Dauphin Co.Rep. 120 (1945), is most often cited in support of the contention that a voter may not waive his right to the secrecy of his ballot. According to Judge Woodside, the secrecy of the ballot

> is sound public policy. It is to prevent intimidation and bribery. When a person has a right to reveal how he voted he can be intimidated into revealing it. . . . If in every close

---

9. For these reasons, we also reject Zupsic's second contention that the court of common pleas should have rejected *all* of the votes in the five tainted districts and awarded him the election based on the results in the remaining districts.

election in this Commonwealth voters could be subpoenaed into Court ... and asked how they voted, bribery and intimidation would become a simple matter, even though the witness after taking the stand would have the legal right to refuse to answer the question.

The sanctity of the ballot must be preserved, and the courts must throw no technicalities in the way of discovering false and fraudulent election returns, but neither can we abandon the keystone of our democracy—the secrecy of the ballot, on the pretense of discovering an error in the return.

57 Dauphin Co.Rep. at 126–27; *see also Orsatti,* 143 Pa. Commw. at 17, 598 A.2d at 1344 (voter cannot be permitted to waive right to secrecy) (citation omitted); *In re General Election of Nov. 4, 1975,* 71 D. & C.2d 83, 91–92 (1975) (voters should not be permitted to testify where no fraud is present).

However, as the court below observed, Judge Woodside also noted in *Crowley* that

[w]e are not prepared to state nor called upon to say that there are no circumstances under which a legal voter will be permitted to take the witness stand on his own circumstances and testify how he voted. There may be circumstances where it is proper.... But, ... where it is possible to determine from the ballots what the vote of the district was, and there is no proof of fraud, we have no authority to accept the oral testimony of the voter as to his vote....

*Crowley,* 57 Dauphin Co.Rep. at 127.

Here, in contrast to *Crowley* and *General Election of Nov. 4, 1975,* the evidence clearly establishes that at some point after election night and before the first recount, fraud occurred with regard to at least some of the ballots. We agree with the lower court that, under the unusual circumstances of this case, the sanctity of the ballot is not best preserved by secrecy, but instead by allowing those whose legitimate votes were altered through no fault of their own to testify, if they so choose, regarding how they originally voted. Therefore, we hold that, under these limited circumstances, where a vote has been properly cast but subsequently altered through no fault

of the voter, the voter should be allowed to *voluntarily* appear and testify regarding how he or she originally voted.

■ Laughlin also claims that the court below erred in denying her motion to disqualify the Beaver County District Attorney and her staff from participating in the election contest. Laughlin maintains that such disqualification was necessary because the District Attorney openly endorsed Zupsic for District Justice. The lower court, however, found no authority for Laughlin's position and concluded that it had no authority to order the District Attorney to refrain from any investigation. *Petition II,* slip op. at 10. Further, if the testimony of the District Attorney's investigator was affected by any conflict, the lower court noted that this would go to the weight of that testimony rather than its admissibility.

■ As the lower court noted, we also find no authority for the proposition that the District Attorney and her staff should have been disqualified from investigating this case. Rule 1.11 of the Rules of Professional Conduct, which Laughlin cites, is clearly inapplicable because it prohibits attorneys in the public sector from participating in matters "in which [they] participated personally and substantially while in private practice." The District Attorney's endorsement of Zupsic has nothing to do with what she may have done in private practice. Further, we agree with the lower court that any supposed conflict of interest would go to the weight of testimony rather than its admissibility. *See, e.g., Weir by Gasper v. Estate of Ciao,* 521 Pa. 491, 501, 556 A.2d 819, 823 (1989) (if conflict of interest existed, it would serve to discredit testimony). Therefore, the trial court did not err in denying Laughlin's motion.

Finally, Laughlin complains that the lower court improperly speculated regarding why she asked for recounts in nine of the precincts that she won according to the initial vote tabulation. However, such consideration is not improper, and even if it were, sufficient evidence still existed to support the lower court's conclusion that the ballots were subject to tampering.

Accordingly, the Order of the Beaver County Court of Common Pleas setting aside the election for District Justice in

Judicial District 36–3–03 is hereby reversed and this matter is remanded to the court of common pleas for proceedings consistent with this opinion.

PAPADAKOS and MONTEMURO, JJ., who was sitting by designation, did not participate in the decision of this case.