Justice NEHRING,
opinion of the Court:
INTRODUCTION
11 This matter comes before us by a petition for extraordinary writ filed by Utah Lieutenant Governor Spencer Cox regarding the Republican primary election for Millard County Commissioner Seat A. The Heutenant governor challenges an August 14, 2014 district court order that set aside the election and ordered the Millard County Clerk to hold a new election as soon as possible.
T2 In an order issued September 5, 2014, we granted the lieutenant governor's petition and affirmed in part and vacated in part the district court's order. We affirmed that portion of the order that set aside the election. However, we vacated the part of the district court order requiring the Millard County Clerk to hold a new election. Recognizing that the election code does not address the specific circumstances presented here, we concluded that it was not the intent of the legislature that a political party be without a candidate on the general election ballot when the primary election has been set aside. We therefore looked to the most analogous provisions of the Code to guide us. Utah Code section 20A-1-501 supplies procedures for filling candidate vacancies in various situations, and we ordered that the Republican candidate be filled according to the procedures in subsection (1)(c)(iii). We explain our order more fully here.
BACKGROUND
T3 On June 24, 2014, Millard County held its Republican primary election for the position of County Commissioner Seat A. Mr. Dyer challenged Mr. Withers, the incumbent. According to Mr. Dyer, the unofficial vote count on the evening of June 24, 2014, yielded 1,004 votes for Mr. Dyer and 1,003 votes for Mr. Withers. The official canvass was conducted on July 1, 2014, at which Mr. Dyer alleged the County Clerk's office produced additional ballots that had not previously been disclosed to the candidates. The canvass tally resulted in 1,014 votes for Mr. Withers and 1,009 votes for Mr. Dyer, and Mr, Withers was declared the winner.
*692 1 4 On July 7, 2014, Mr. Dyer requested an official recount under Utah Code section 20A-4-401, specifically challenging nine ballots as well as all provisional ballots because they had not been disclosed to him until after the official canvass. County Clerk Brunson conducted the recount on July 15, 2014. She certified the results of the recount as 1,014 votes for Mr. Withers and 1,009 votes for Mr. Dyer,
$5 The county commissioners met the same day to sit as the official canvassing board. Mr. Withers sat on the canvassing board in his official capacity as a county commissioner. The board discussed the recount, heard Mr. Dyer's arguments, and took public comments. In the end, the three-member canvassing board voted to certify the clerk's count and declared Mr. Withers the winner.
16 On July 16, 2014, Mr. Dyer together with concerned voters T.J. Lovato, Russell Jones, and Wendy Leathum (collectively, Voters)[1] filed a petition under Utah Code sections 20A-4-402 and 20A-4-403 contesting the results of the election. The petition named Mr. Withers, in his capacity as a candidate, as the sole respondent. The petition specifically challenged twenty-one votes: three absentee ballots, two voter forms, one potentially non-Republican voter, ten provisional ballots, four ballot affidavits, and one voter prevented from voting.
T7 On August 1, 2014, the district court held a hearing on the matter in which Mr. Dyer, the Voters, and Mr. Withers were present and represented by counsel. Millard County Clerk Brunson also appeared as a witness.
T8 The district court issued its Memorandum Decision, Ruling, and Order on August 14, 2014. At the outset, the court noted that "petitioners had probably filed this ease against the wrong respondent." Nonetheless, the court heard and ruled on the case because neither party raised the issue of improper parties The. court discussed each of Mr. Dyer's allegations in turn and ultimately concluded that "the validity of this election cannot be established." The court determined that at least seven ballots were incorrectly counted and one voter was prevented from legally voting; therefore, because only five votes separated the candidates, the eight votes in question were sufficient to grant relief, The court explained that it could not determine for whom those illegal votes had been cast, and thus could not ascertain which candidate received the highest number of votes in order to declare a winner. Instead, the district court set aside the election results and ordered the county clerk to organize a new election immediately. Neither party appealed the district court's order.
T9 On August 26, 2014, the Heutenant governor filed a petition for extraordinary writ with this court challenging the district court order. The lieutenant governor petitions this court because he asserts that, as chief elections officer for the state of Utah, he "is substantially impacted by" the district court order. And because he was not named as a party below and cannot appeal the order, he therefore contends that he has no other plain, speedy, and adequate remedy. The lieutenant governor seeks to vacate the district court order and affirm the certified results of the primary election.
'I 10 The lieutenant governor raises three arguments in his petition. First, he contends that the district court did not have jurisdiction to adjudicate Mr. Dyer's petition due to a lack of standing. Second, the lieutenant governor alleges that Mr. Dyer's challenge did not meet the statutory requirement for election contests because the Heutenant governor reads the statute to "require[ ] proof" of a different result "if you added or subtracted the actual votes." He asserts that because the district court could not determine for whom the erroneous votes were cast, there is no proof that the illegal votes would have changed the result. Thus, in the absence of a final determination that Mr. Dyer would have won, he argues that there can be no valid contest of the election and the district court had no basis to issue its *693 order. Third, the lieutenant governor argues that the district court acted outside its powers when it ordered the clerk's office to hold a new election.
4 11 On September 3, 2014, Judge Layeock filed a response to the lHeutenant governor asking this court to affirm the district court order. The response asserts that the district court had jurisdiction below and that it properly set aside and ordered a new election.
112 Mr. Dyer also filed a response and opposition to the lieutenant governor as a real party in interest. Mr. Dyer argues that he had standing because he was not required to name the county clerk as a party to the action below. Additionally, he asserts that the lieutenant governor is not an appropriate party to file a writ in this matter because his role as chief election officer is purely supervisory. He further argues that the lieutenant governor's filing of the petition amounts to improper advocacy on the part of Mr. Withers's candidacy. '
183 Millard County and the Millard County Clerk also entered the fray, agreeing with the lieutenant governor's petition that the district court acted beyond its statutory authority in ordering the new election. The county and county clerk also noted that the clerk's office considered options for holding a new election, but that it "could not comply with the statutory deadlines imposed by Utah law."
14 Finally, in addition to responding to the lieutenant governor, the Voters, acting through counsel or pro se, submitted a third-party cross-petition. They requested that this court affirm the district court's order to set aside the primary election, but alternatively requested that both candidates be included on the November general election ballot as unaffiliated candidates, even if that requires "suspend[ing] or modifflying]" the statute "as necessary."
T 15 We have jurisdiction under Utah Code section 78A-3-102(2).
STANDARD OF REVIEW
{16 This matter is before us by petition for extraordinary writ under Utah Rule of Civil Procedure 65B. The granting of relief is discretionary, and "[ululike a party filing a direct appeal, a petitioner seeking rule 65B(d) extraordinary relief has no right to receive a remedy that corrects a lower court's mishandling of a particular case." [2] "The question of whether to grant a petition for extraordinary relief lies within the sound discretion of this court." [3]
117 Rule 65B provides for the seope of review when, as here, wrongful use of judicial authority is alleged: "[The court's review shall not extend further than to determine whether the respondent has regularly pursued its authority." [4] We have held that "[al court wrongfully uses its judicial authority when it abuses its discretion."[5] When the issue before the court involves statutory interpretation, "a mistake of law may constitute an abuse of discretion."[6] However, even where a mistake of law or abuse of discretion is found, this court nonetheless retains discretion whether to grant the relief requested.[7] Thus, we have explained that "a court must look to the nature of the relief sought, the circumstances alleged in the petition, and the purpose of the type of writ sought in deciding whether to grant extraordinary relief"[8] Therefore, we review the district court order for abuse of discretion, retaining our discretion to grant any relief.
ANALYSIS
1 18 We first consider whether to grant the lieutenant governor's petition for extraordinary writ challenging the district court order. *694 We conclude that the lieutenant governor had no other plain, speedy, and adequate remedy, and we therefore grant the petition. Next, a majority of this court holds that the district court order annulling and setting aside the election could not be challenged following the expiration of the ten-day statutory appeal deadline; that portion of the order is therefore affirmed. However, we determine that the district court exceeded its authority when it ordered a new election. Such an order constitutes an abuse of disceretion, and we vacate that part of the order. However, we recognize that the Utah Code does not prescribe procedures to fill a candidate vacancy when a primary election is annulled and set aside. We conclude that it could not have been the intent of the legislature to leave the candidacy vacant, and we therefore look to the most analogous provisions in the election code to ascertain how the legislature intended the current situation to be resolved. We conclude that the procedures for filling a candidate vacancy under Utah Code section 20A-1-501 provide useful guidance. On that basis, we order the Republican candidacy be filled according to its provisions. Finally, we deny the third-party cross-petition because an alternative remedy is available in the form of an appeal, where cross-petitioners were parties to the proceedings below.
I. WE GRANT THE LIEUTENANT GOVERNORS PETITION FOR EXTRAORDINARY WRIT
{19 Rule 65B permits a person to petition this court for relief based on several enumerated grounds if "no other plain, speedy and adequate remedy is available." Whether to grant the petition is a threshold question in this case and the determination "lies within the sound discretion of this court."[9] In determining whether to grant the petition, we look to several factors, including "the egregiousness of the alleged error, the significance of the legal issue presented by the petition, the severity of the consequences occasioned by the alleged error, and any additional factors that may be regarded as important to the case's outcome." [10]
120 We conclude that the lieutenant governor had no other plain, speedy, and adequate remedy, and we therefore grant the petition. The lieutenant governor seeks relief under Utah Rule of Civil Procedure 65B(d)(2)(A) where "an inferior court ... has exceeded its jurisdiction or abused its discretion." As the state's chief elections officer, the lieutenant governor has an interest in the election contest, even if his authority over a county primary election is only supervisory. Because he was not a party to the action below, the lieutenant governor could not appeal the district court's decision [11] and therefore did not have another plain, speedy, and adequate remedy.[12] Moreover, we do not find that the lieutenant governor's decision not to intervene in the case below forecloses his petition for relief.[13] We have recognized that where parties are not necessary, they may make tactical decisions not to intervene.[14] Furthermore, given the significance of the legal issues presented and the necessi *695 ty of prompt resolution in advance of the general election,"[15] we conclude that a petition for extraordinary writ should be granted. Having granted the petition, we turn to the merits of the lieutenant governor's arguments.
II. STATUTORY APPEAL DEADLINE
121 I disagree with this court's holding that the district court order to annul and set aside the election "became unassailable when no appeal was taken by the parties" within the ten-day deadline set by statute.[16] I would therefore reach the merits of the lieu tenant governor's arguments on that issue.
122 The Utah Constitution grants this court "original jurisdiction to issue all extraordinary writs," [17] and we may issue the writ when "no other plain, speedy and adequate remedy is available." [18] Thus, we will only issue a writ in exceptional cireum-stances, balancing due deference to the legislature with our constitutional prerogative. For example, in Renn v. Utah State Board of Pardons, this court permitted a defendant to challenge a decision by the Board of Pardons through an extraordinary writ even though the legislature had insulated Board decisions from judicial review."[19] We allowed the challenge because "where there is a gross and flagrant abuse of discretion and fundamental principles of fairness are flouted, a court may, giving appropriate deference to legislative policy[,] ... intervene to correct such abuses by means of an appropriate extraordinary writ."[20] In my view, the lieutenant governor has alleged just such an abuse, claiming that the district court erroneously denied Mr. Withers his candidacy and citizens their right to vote. As Utah's chief election official, the lieutenant governor had an interest in the outcome of the case. But because he was not a party below, the only remedy available to him was through a writ. I believe this situation rises to the level of the sort of exceptional cireumstance that an extraordinary writ was meant to address.
23 Therefore, I would conclude that the Heutenant governor's request was not foreclosed by the statutory language declaring the office vacant at the close of the parties' ten-day appeal deadline. Certainly election contests represent a unique form of litigation due, in part, to their time-sensitive nature. It is presumably for this reason that the legislature provided the brief ten-day window for the parties to appeal an election decision. But the issuing of a writ is an equitable power derived from our duty to prevent a "flagrant abuse of discretion." [21] To declare the district court's decision insulated from review curtails our constitutional power and deprives the lieutenant governor of the only remedy available to him. I also note concern about possible due process implications for individuals whose interests may be affected because they were not made parties to the action and may not have had notice or a meaningful opportunity to be heard. We have extolled "the practical utility of the flexibility of extraordinary writs in various cireumstances," [22] and I believe such flexibility is warranted here.
1 24 I would instead evaluate the lieutenant governor's request under the equitable doctrine of laches. We have explained that under rule 65B "there is no fixed limitation period governing the time for filing" extraordinary writs.[23] However, we cautioned that a writ "should be filed within a reasonable time after the act complained of has been *696 done or refused" because "the equitable doe-trine of laches is available to dismiss untimely writs." [24] I believe that in filing his petition on August 26-twelve days after the district court's order-the Heutenant governor acted within a reasonable time. Under the doctrine of laches, we look to a party's lack of diligence and the resulting injury.[25] I cannot say that the Heutenant governor acted without diligence when he submitted his petition less than two weeks after the district court order, particularly given that he was not a party to the action below and may not have had notice of the election contest. I therefore would conclude that the lieutenant governor could challenge the district court order to annul and set aside the election, and I would reach the merits of that claim.
III. THE DISTRICT COURT ORDER SETTING ASIDE THE ELECTION WAS PROPER
125 The lieutenant governor asserts, and the dissent agrees,[26] that Mr. Dyer did not satisfy the statutory requirements for an election contest. The Heutenant governor argues that a court "cannot sustain an election contest unless it determines who the individual votes were for and how their addition or subtraction from the vote totals of the candidates would change the result." We do not agree with this interpretation of the statute's election contest procedures. We hold that Mr. Dyer satisfied the requirements of the statute, and that the district court properly annulled and set aside the election.
A. My. Dyer and the Voters Could Properly Sustain Their Election Contest
126 The lieutenant governor claims that Mr. Dyer did not satisfy the requirements of the election contest statute. He bases his argument on a reading of Utah Code section 20A-4-402, which provides the grounds upon which a contest may be brought. Mr. Dyer and the Voters base their challenge on the following statutory grounds:
(1) The ... nomination of any person to any public office ... may be contested according to the procedures established in this part only:
(a) for malconduct, fraud, or corruption on the part of the judges of election at any polling place, or of any board of canvassers, or any judge or member of the board sufficient to change the result;
[[Image here]]
(d) when illegal votes have been received or legal votes have been rejected at the polls sufficient to change the result;
(e) for any error of any board of canvassers or judges of election in counting the votes or declaring the result of the election, if the error would change the result;
[[Image here]]
(f) when the election result would change because a sufficient number of ballots containing uncorrected errors or omissions have been received at the polls;
[[Image here]]
(h) when an election judge or clerk was a party to malconduct, fraud, or corruption sufficient to change the result of the election.... [27]
The lieutenant governor reads this provision to "require[( ] proof that the result would have been different if you added or subtracted the actual votes." We disagree. The statutory condition that the alleged maleon-duct, errors, or Hlegal voting be "sufficient to change the result" acts as a threshold materiality requirement. Ostensibly, the legislature believed that an election contest that cannot possibly lead to a different result does not warrant the time and attention of the court. By way of example, consider an election resulting in a 100-vote margin between two candidates. If the defeated candidate brought a challenge alleging that forty illegal *697 votes had been counted, such a challenge, even if proven, could not impact the final result. It would not merit review by a court, and thus the legislature likely sought to prevent such immaterial contests. In contrast, when a challenger alleges errors that could actually change the result, the court's review is warranted.
127 The Heutenant governor's interpretation of the statute would foreclose a challenge any time the ballots could not be opened, reviewed, and recounted.[28] Under this approach, even in circumstances where there is wide-scale or egregious conduct (for example, intentional burning of ballot boxes), a defeated challenger may have no recourse because the votes could not be counted. We elect to take a more sensible approach-an approach that comports with the statute's plain language. We hold that a contest may move forward under section 20A-4-402(a), (d), (e), (£, or (b) where a candidate challenges enough votes to meet or exceed the margin of victory.
128 Additionally, this approach does not open the floodgates to election contests. Challengers remain bound by our civil pleading standards.[29] Additionally, the election code itself provides a heightened pleading requirement. Section 20A-4-408(2) sets forth filing procedures for a petition to contest a primary election. Where, as here, illegal voting is alleged, the candidate must provide the name and address of each person whose vote he intends to contest at trial.[30] If a voter is not included on the petition list, the challenger forfeits his right to contest that vote.[31] This requirement provides a significant hurdle to prevent individuals from indiscriminately challenging elections without evidence of wrongdoing or errors.
129 Moreover, even with carefully prescribed instructions for election contests, the statute nowhere requires a challenger to state for whom each disputed vote was cast.[32] The lieutenant governor cites section 20A-4-408(2)(c) as evidence that the votes must be capable of a final accounting. This section provides that when challenging illegal votes or rejected legal votes, "it is sufficient to state generally" that illegal votes were given to the declared winner or legal votes were denied another candidate such that the final tally of legal votes would yield a different winner.[33] But, as explained above, that seetion merely sets forth the general filing procedures. It does not speak to the ultimate level of proof required for the contested votes. Section 20A¥-4-403(2)(a) prescribes when and where the petition is to be filed, subsection (b) details the required contents of the petition, and subsection (c) provides the applicable pleading standard for the petition. This pleading standard simply requires the challenger to allege enough wrongly counted or wrongly rejected votes, which, if proven, would yield a different victor than the person declared elected. Moreover, the statute requires the challenger only to "state generally" his allegations regarding the disputed vote count. Thus, this language cannot be read to require the challenger to submit definitive proof of the final election *698 result. It is enough to challenge the number of votes that would be sufficient to change the result, even if that result cannot be determined.
30 In sum, because Mr. Dyer challenged over twenty votes as illegal in an election with a five-vote margin, we hold that he met his pleading burden and his election contest was properly before the district court.
B. The District Court Properly Set Aside the Election
1 81 The lieutenant governor contends that the district court had no authority to annul and set aside the election under the grounds asserted by Mr. Dyer. He bases this conclusion on Utah Code section 20A-4-402, which he reads to require a challenger to prove the candidate who would have received each contested vote. Because we do not agree with his interpretation of that provision,[34] we decline to adopt his limitation of the remedies available under section 20A-4-404.
T 32 Section 20A-4-404(4)(c) sets forth the remedies available in an election contest:
(c)) After all the evidence in the contest is submitted, the court shall enter its judgment, either confirming the election result or annulling and setting aside the election.
(ii) If the court determines that a person other than the one declared elected received the highest number of legal votes, the court shall declare that person elected.
Thus, under this provision, a court may confirm the election results, annul and set aside the election, or declare a winner if one can be determined. The lieutenant governor contends that these remedies cannot be provided in all circumstances, but that they correspond to two different types of election contests under section 20A-4-402(1); (a) grounds that render the candidate ineligible [35] and (b) grounds that votes were improperly received, rejected, or counted.[36] He argues that annulling and setting aside an election is appropriate only when the candidate has been ruled ineligible. In contrast, when the grounds relate to illegal votes, he argues that the court is statutorily mandated to declare a winner. This reading is based on the lieutenant governor's interpretation of section 20A-4-402. Under his view, when there is a challenge based on illegal votes, the court must be able to determine for whom each disputed vote was cast because it must know whether the challenge is sufficient to change the election result. He argues that, given that premise, the court must necessarily be able to determine a winner and thus, under section 20A-4-404(4)(c)@), is mandated to "declare that person elected."
1 33 We conclude that the statute does not so constrain the courts. As explained above, we read the statute to permit an election contest even if the contested votes cannot ultimately be counted, as when ballots are lost or destroyed. But neither the plain language of the text nor the structure of the provisions suggests that the statutory remedies correspond to only certain types of challenges. The legislature has empowered district courts to review evidence in a variety of election cireumstances and either confirm the result or annul and set aside the election. The court must declare a winner, but only if a winner can be determined.[37] Thus, on its face, the statute contemplates a situation in which the court will be unable to determine a winner. The court need not confirm an election result when it finds illegal voting has occurred but cannot count the votes.
134 The statutory structure also reinforces this understanding.[38] The legislature did not divide the grounds into separate categories and specifically assign remedies based on their type. And there is no limiting language that suggests certain remedies apply only to specific contests. Rather, the structure of the statute-one provision setting *699 forth the contest grounds (section 20A-4-402) and one provision for available dispositions (section 20A-4-404)-indicates the intent that all remedies be available regardless of the contest ground asserted.
135 In the present case, the district court considered the contested votes individually and determined that seven had been illegally cast and one legal voter had been prevented from voting. The court did not go on to consider the additional ballots that had been contested because it found that eight illegal votes in a five-vote- margin election were enough to warrant setting aside the election results. It also concluded that a winner could not be determined due to the mishandling of the contested ballots. Therefore, the district court was not bound to declare a winner in such cireumstances.
IV. THE DISTRICT COURT ORDER MANDATING A NEW ELECTION CONTRADICTS EXPRESS STATUTORY LANGUAGE
136 We next consider that part of the district court order mandating the Millard County Clerk to hold a new primary election. Because we conclude the district court acted in contravention of the statute, we find that the court abused its discretion and reverse that portion of the order.
137 The lieutenant governor challenges the district court's order to hold a new election because he argues that the statutory language does not authorize a court to order a special election. In its response to the lieutenant governor's petition, the district court acknowledged that the "election statutes seemingly do not answer the question of what should or must happen once an election is set aside. The statutes do not provide a remedy beyond the election being invalidated." The court asserted, therefore, that absent further court action, both the candidates and the voters of Millard County would be left without an adequate remedy. Citing the court's equitable power, the district court explained that it ordered a new election as a means to provide relief to all parties.
138 Utah Code section 20A-4-404 sets forth the means of disposition for an election contest. After reviewing all the evidence, the court may confirm the election result, annul and set aside the election, or, if it is possible, declare another person the winner.[39] The statute nowhere authorizes the court to order a new election. Additionally, in the provision governing appeals of an election contest decision, the Utah Code provides that "[wlhenever an election is annulled or set aside by the judgment of a court and no appeal is taken within 10 days, the certificate of election, if any has been issued, is void, and the office is vacant." [40] Moreover, the cireumstances for authorizing a special election are expressly limited and do not encompass the situation presented here.[41]
139 Recognizing that the district court sought to fashion the most appropriate remedy given the cireumstances, we nonetheless hold that by ordering the new election the district court contravened the dictates of the election code. This mistake of law constituted an abuse of discretion warranting extraordinary relief; we therefore reverse that part of the district court order.
V. IN THE ABSENCE OF CLEAR STATUTORY DIRECTION, WE LOOK TO ANALOGOUS PROVISIONS TO CARRY OUT THE INTENT OF THE LEGISLATURE
T40 Having affirmed annulment of the election, our task is not complete. We have repeatedly asserted that "this Court's primary responsibility in construing legislative enactments is to give effect to the Legislature's underlying intent." [42] Our duty is directed by the statute's "plain language, in light of the purpose the statute was meant to *700 achieve." [43] And "[when the plain meaning of the statute can be discerned from its language, no other interpretive tools are needed." [44]
T41 This case, however, does not present a situation of vague or ambiguous statutory language. Instead, the Code is silent regarding these circumstances. There is no provision in the election code that de-seribes how to fill a candidate vacancy in the case of an annulled primary election,[45] and the limited grounds under which a special election can be held do not apply here.[46] We conclude, however, that the legislature did not intend the vacancy resulting from an annulled primary to continue in perpetuity. We therefore look to analogous provisions within the election code to carry out the legislature's intent.
142 From the outset, we emphasize that we do not undertake such an endeavor lightly. Our task is to seek the intent of the legislature, not to substitute our own wisdom in its stead.[47] To that end, when a statute is silent regarding particular ciream-stances and we determine that such a gap was not the intent of the legislature, "we must determine the best rule of law to ensure that the statute is applied uniformly." [48] We "analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and, purpose." [49]
4 43 Section 20A-1-501 of the election code provides procedures for filling candidate vacancies before a general election. While it does not address the specific cireumstances here, it presents the closest analogy to it and is therefore instructive. Under certain circumstances, for most local positions, "the county central committee of a political party . may certify the name of another candidate to the appropriate election officer." [50] The statute then provides for three seenar-ios: (a) replacement of a candidate before the primary election, (b) replacement of a candidate who was certified without a primary election, and (c) replacement of a candidate who won the primary election.[51] In each case, the party may select a replacement candidate if the original candidate dies, resigns due to a physical or mental disability, or is disqualified by an election official for improper filing or nominating procedures.[52]
*701 144 Utah Code section 20A-1-501 does not address a situation in which the result of a primary election is set aside. The lHeuten-ant governor contends that this silence means that the party will simply be without a candidate on the general election ballot. Although the statute is silent on this situation, we disagree with the Heutenant governor's interpretation of the statutory scheme. Seetion 20A-1-501 provides a means for political parties to submit a candidate in an emergen-ey situation. The cireumstances provided for in the statute therefore reflect the most common situations that would render a political party without a candidate. Section 20A-1-501 also appears to strike a balance between respecting voter decisions in primary elections and ensuring that political parties can make necessary substitutions. If replacements were permitted in all cireumstances, a political party could effectively overrule the decision of its voters in the primary election and name its own candidate. By allowing the party to submit a replacement candidate only in rare cireumstances, the legislature respects the choice of voters. But where the party is left without a candidate through no fault of its own, it should be able to substitute one. ~
I 45 The Code's midterm vacancy protocols are instructive as well. There, the legislature set forth various procedures for filling a midterm vacancy depending on the timing of the vacancy.[53] If the vacancy arises well before the primary election, the procedure parallels a regular election-a nominated party candidate or a qualified independent candidate can run in the general election.[54] But if the vacancy arises closer to the date of the general election, the procedures reflect the expedited timeline.[55] The statute even permits a party to summarily place an individual in office for the remainder of the unexpired term."[56] It would make little sense for the legislature to so empower a political party for midterm vacancies and yet leave the party unable to name its own candidate for the general election ballot. If political parties can "summarily certify" a candidate for the general election ballot even before the primary election date,"[57] it stands to reason that a party may summarily certify a candidate when the primary itself is annulled.
4 46 We therefore determine that the legislature did not intend that a political party be entirely foreclosed from nominating its candidate in advance of the general election when the primary has been set aside through no fault of the party. We conclude that section 20A-1-501(1)(c)(iii) regarding candidacy va-eancies presents the closest analogy to the present situation and thus order that the Republican candidate be certified according to the procedures therein.
VI. THE CROSS-PETITION FOR EXTRAORDINARY RELIEF IS DENIED AS PROCEDURALLY IMPROPER
147 The Voters also submitted a third-party cross-petition for extraordinary relief, requesting this court to order that both candidates be placed on the November general election ballot. We deny the eross-petition as an improper means of petitioning this court. As noted above, a petition for extraordinary writ is appropriate only when "no other plain, speedy and adequate remedy is available."[58] When the petitioner is a party to the action below and seeks alternate relief from the district court order, there is *702 an adequate remedy available-namely, an appeal. Thus, "[blefore we can address a petition for extraordinary relief, the petitioning party must have exhaust[ed] all available avenues of appeal."[59] The purpose of this rule is to "keep litigants from bypassing traditional avenues for judicial relief, or in other words from substituting the extraordinary writ process for what should have been ordinary litigation." [60]
148 Cross-petitioners were all parties to the action below. As such, they possessed a right of appeal from the district court order. Should they seek relief contrary to that order, the appropriate means is through an appeal, not through an extraordinary writ to this court.[61] The cross-petition is therefore denied.
CONCLUSION
149 We grant the petition because the lieutenant governor could not appeal the district court's decision and did not have another plain, speedy, and adequate remedy. We uphold the district court order to annul and set aside the election. But we determine that the court exceeded its statutory authority when it ordered the county to hold a new election, and we therefore vacate that part of the order. Instead, by looking to analogous provisions within the election code, we determine that the legislature did not intend for the party candidacy to sit vacant before the general election. Thus, we ordered the candidacy to be filled in accordance with the procedures found in Utah Code section 20A-1-501. Finally, we deny the Voters' cross-petition as procedurally improper.

. Additional voters Scott Blackburn, Todd MacFarlane, and Steve Maxfield later joined the district court proceeding.

. Statev. Barrett, 2005 UT 88, ¶ 23, 127 P.3d 682.

. Snow, Christensen & Martineau v. Lindberg, 2013 UT 15, ¶ 22, 299 P.3d 1058.

. Urag R. Civ. P. 65B(d)(4).

. Snow, Christensen & Martineau, 2013 UT 15, ¶ 21, 299 P.3d 1058.

. Barrett, 2005 UT 88, ¶ 26, 127 P.3d 682.

. Id. ¶ 23 ("[A] party petitioning for rule 65B(d) extraordinary relief is not entitled to receive relief, even if that party successfully establishes that a lower court abused its discretion....").

. Id. ¶ 11 (internal quotation marks omitted).

. Snow, Christensen & Martineau v. Lindberg, 2013 UT 15, ¶ 22, 299 P.3d 1058.

. Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg, 2010 UT 51, ¶ 24, 238 P.3d 1054 (internal quotation marks omitted).

. See Utah Down Syndrome Found., Inc. v. Utah Down Syndrome Ass'n, 2012 UT 86, ¶¶ 9-10, 293 P.3d 241 (holding that nonparties cannot appeal a court order). Moreover, the lieutenant governor could not appeal the district court decision even if the parties below did not object because "acquiescence of the parties is insufficient to confer jurisdiction on the court." Bradbury v. Valencia, 2000 UT 50, ¶ 8, 5 P.3d 649 (internal quotation marks omitted).

. See Snow, Christensen & Martineau, 2013 UT 15, 124, 299 P.3d 1058 ("[When an individual who is not a party to a district court proceeding is adversely affected by an order or judgment, the procedural mechanism for challenging the district court's action is through a petition for extraordinary writ.").

. Krejci v. City of Saratoga Springs, 2013 UT 74, ¶ 12, 322 P.3d 662 (refusing to adopt a rule requiring "intervention as a prerequisite to the filing of a petition for extraordinary writ").

. Id. 118 (recognizing that "petitioners' decision to sit on the sidelines [during district court proceedings] was both strategically and economically defensible").

. Id. ¶ 20 (noting that petitioner could have filed a separate suit in district court regarding a ballot referendum but given "the need to seek relief occurred so shortly before the ballot decision would have to be made, a new proceeding in the district court was not a 'speedy' or 'adequate' remedy").

. Infra ¶¶ 60-66.

. Uran Const. art. VIII, § 3.

. Urag R. Civ. P. 65B(a).

. 904 P.2d 677, 683-84 (Utah 1995).

. Id.; see State v. Barrett, 2005 UT 88, ¶ 19, 127 P.3d 682 (recognizing that in Renn "we relied upon this court's constitutional authority to issue extraordinary writs" even though "the statute foreclos[ed] judicial review").

. Renn, 904 P.2d at 683.

. Id. at 684.

. Id.

. Id.

. Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg, 2010 UT 51, ¶ 27, 238 P.3d 1054.

. Infra ¶¶ 51-59.

. Uraxu Cope § 20A-4-402 (emphases added).

. At oral argument, counsel for the lieutenant governor argued that a court could determine for whom a particular individual voted through voluntary testimony by the voter or by looking to circumstantial evidence such as party affiliation or whether a voter put signs for a particular candidate in his front yard. Because we disagree with the lieutenant governor's statutory interpretation, we do not reach this issue. However, we express great suspicion that these types of circumstantial evidence could properly be relied upon to determine the outcome of an election. See 29 C.J.S. Elections § 480 ("As a general rule, a legal voter cannot be compelled to disclose for whom he or she voted."); see also Helm v. State Election Bd., 589 P.2d 224, 229 (Okla.1979) (''There can be no doubt that where paper ballots are concerned, the testimony of voters as to how they voted is not competent."). But see In re Petition to Contest the Gen. Election for Dist. Justice in Judicial Dist, 36-3-03 Nunc Pro Tunc, 543 Pa. 216, 670 A.2d 629, 638-39 (1996) (allowing voluntary testimony of voters as evidence of how they originally voted).

. See Utau R. Civ P. 8(a) (providing that a claim "'shall contain a short and plain: (1) statement of the claim showing that the party is entitled to relief; and (2) demand for judgment for specified relief").

. Urar Cope § 20A-4-403(2)(b)(vii).

. Id. §

. Id. § 20A-4-403.

. Id. § 20A-4-403(2)(c).

. See supra Part III.A.

. Uran Cope § 20A-4-402(1)(b), (c), and (g).

. Id. § 20A-4-402(1)(a), (d), (e), (F), and (b).

. Id. § 20A-4-404(4)(c)(ii).

. See Hi-Country Prop. Rights Grp. v. Emmer, 2013 UT 33, ¶¶ 23-28, 304 P.3d 851 (looking to the "structure and context" of the statute to determine its meaning); State v. Smith, 2005 UT 57, ¶¶ 11, 13, 122 P.3d 615 (confirming the meaning of a statute based on its "plain language and structure").

. Ura Cope § 20A-4-404(4)(c).

. Id. § 20A-4-406(2).

. See id. § 20A¥-1-203(5)(a) (providing that a local legislative body may call a special election "only for" certain enumerated circumstances).

. W. Jordan v. Morrison, 656 P.2d 445, 446 (Utah 1982).

. J.M.W. v. T.I.Z. (In re Adoption of Baby E.Z.), 2011 UT 38, ¶ 15, 266 P.3d 702 (internal quotation marks omitted).

. LPI Servs. v. McGee, 2009 UT 41, ¶ 11, 215 P.3d 135.

. See Urax Cope § 20A-1-501 (providing procedures to fill candidate vacancies); id. § 20A-1-508 (midterm vacancies).

. See id. § 20A-1-203(5).

. Eames v. Bd. of Comm'rs, 58 Utah 495, 199 P. 970, 972 (1921) ("It is the duty of this court, according to its best knowledge and understanding, to declare the law as it finds it, and determine the intent and purpose thereof from the language used by the Legislature in expressing such purpose and intention.").

. Mariemont Corp. v. White City Water Improvement Dist., 958 P.2d 222, 226 (Utah 1998); see also Fausnight v. Perkins, 994 So.2d 912, 922 . (Ala.2008) (See, J., concurring) ("When a statute is silent, this Court will look outside of the plain language of the statute to determine the intent of the legislature."); State v. Mootz, 808 N.W.2d 207, 221 (Iowa 2012) ("When the statutory language is silent, legislative intent can be gleaned from the purposes and underlying policies of the statute, along with the consequences of various interpretations."); Anderson v. Ochsner Health Sys., 2013-2970, p. 3 (La.7/1/14) 134 So.3d 1184 ("[Blecause the statute is silent ..., the court, in interpreting the statute, is tasked with determining the legislative intent."); Griffin v. Griffin, 92 A.3d 1144, 1149 (Me.2014) ("If the statutory language ... is silent on a particular point, we will then consider other indicia of legislative intent including the purpose of the statute." (internal quotation marks omitted)); Miss. Methodist Hosp. & Rehab. Ctr. v. Miss. Div. of Medicaid, 21 So.3d 600, 607 (Miss.2009) a statute ... is silent on a specific issue[].... the ultimate goal of this Court is to discern the legislative intent." (citation omitted)); Ogborne v. Mercer Cemetery Corp., 197 N.J. 448, 963 A.2d 828, 834 (2009) ("In light of the Act's silence on the issue, we look to the underlying legislative intent."); Clarkston v. Bridge, 273 Or. 68, 539 P.2d 1094, 1099 (1975) ("When the legislature has not spoken on a particular issue which arises under a statute, it is our duty to determine their probable intent.").

. Mariemont Corp., 958 P.2d at 225 (internal quotation marks omitted).

. Cope § 20A~1-501(1).

. Id.

. Id.

. Id. § 20A-1-508.

. Id. § 20A-1-508(3).

. See id. § 20A-1-508(4) (when a vacancy arises after April 9 but more than 75 days before the primary election, candidates have five days to submit their names and the political party will select among them); id. § 20A-1-508(3) (when a vacancy arises 75 days or less before the primary election but more than 65 days before the general election, the political party "shall summarily certify" a candidate for the general election ballot).

. Id. § 20A-1-508(6) (when a vacancy arises less than 65 days before general election, the political party of the prior office holder may submit an individual to serve the unexpired term).

. Id. § 20A-1-508(5).

. Uran R. Civ. P. 65B(a).

. Friends of Great Salt Lake v. Utah Dep't of Natural Res., 2010 UT 20, ¶ 23, 230 P.3d 1014 (second alteration in original) (internal quotation marks omitted); accord Krejci v. City of Saratoga Springs, 2013 UT 74, ¶ 10, 322 P.3d 662 ("[WJhere a petitioner had an opportunity to file an appeal but failed to do so, it cannot use an extraordinary writ to gain a second shot at an appeal.").

. Krejci, 2013 UT 74, ¶ 10, 322 P.3d 662.

. See Friends of Great Salt Lake, 2010 UT 20, ¶ 23, 230 P.3d 1014 ("[The opportunity to appeal ... constitutes a plain, speedy and adequate remedy[;] ... an extraordinary writ is not a proceeding for general review." (internal quotation marks omitted)).