Chief Justice DURRANT,
concurring in part as to Part ILB of Associate Justice LEE's opinion and dissenting as to Part ILA:
1 43 This case presents us with two questions: (1) whether the legislature intended to mean "district court judge" when it used the term "hearing officer" in the UPWA, and (2) whether an employer may unilaterally withhold wages without first seeking authorization from an administrative law judge or a hearing officer.
T44 As to the first question, we conclude that the term "hearing officer" is unambignous and does not encompass "district court judge." But because interpreting the statute in that manner leads to results so patently absurd no reasonable legislator could have *1001 intended them, we reform the statute under the absurdity doctrine to read hearing officer, administrative law judge, or "district court judge." The lead opinion reaches the same result on this issue, but does so by concluding that the term "hearing officer" is ambiguous and applying the absurd consequences canon to read "hearing officer" as including district court judges. We reject this interpretive approach, however, because it risks allowing future courts to inject policy concerns into an analysis that should and has traditionally focused on the terms of the statute.
145 As to the second point, however, I dissent from the majority's conclusion that the UPWA allows an employer to unilaterally withhold wages without first obtaining authorization to do so from an administrative law judge, a hearing officer, or a district court judge. The majority's reading is inconsistent with the text and structure of the statute and frustrates the central purpose of the UPWA, which is to ensure that employees receive prompt payment of earned wages. The majority effectively gives an employer a lien in the form of withheld earned wages to secure any counterclaims it has against the employee. In my view, this is not what the legislature intended. Accordingly, I respectfully dissent. I would affirm the district court's decision and hold that the plain meaning and structure of the statute require a preliminary proffer of evidence warranting an offset before an employer withholds earned wages, not after.
I.. Applying the Plain and Technical Meaning of "Hearing Officer" Leads to Absurd Results
146 Our caselaw recognizes two different interpretive tools concerning absurdity. We have referred to the first as the absurd consequences canon [15] and to the see-ond as the absurdity doctrine[16] We apply the absurd consequences canon to resolve ambiguities in. a statute.[17] If statutory language lends itself to two alternative readings, we choose the reading that avoids absurd consequences.[18] The absurdity doctrine, by contrast, has nothing to do with resolving ambiguities. Rather, we apply this canon to reform unambiguous statutory language where applying the plain language leads to results so overwhelmingly absurd no rational legislator could have intended them.[19]
T 47 It is important that we carefully distinguish between the absurd consequences canon and the absurdity doctrine because the invocation of the latter is a far more momentous step than is the invocation of the former, and therefore requires a more compelling justification. In applying the absurd consequences canon, we merely resolve an ambiguity by choosing "the reading that avoids absurd results" when "statutory language plausibly presents [us] with two alternative readings."[20] By contrast, when we apply the absurdity doctrine, rather than simply preferring one plausible reading over another, we interpret the statute "contrary" to its plain meaning.[21]
€48 This is a drastic step, one we have described as "strong medicine, not to be *1002 administered lightly."[22] Accordingly, we apply the absurdity doctrine with more caution than we do the absurd consequences canon.[23] This is because when a statute is ambiguous, we are uncertain which reading of the statute the legislature intended, so we presume they intended the reading that leads. to the more practical outcome. But when a statute is unambiguous, the statutory language is almost always irrefutable evidence of the legislature's intent, even if it.leads to results we regard as impractical or ill-advised. So to override the plain language under the absurdity doctrine, the operation of the plain language must be more than improvident, it must be so overwhelmingly absurd that no rational legislator could have intended the statute to operate in such a manner.[24]
149 It is therefore critical that we be exacting in our ambiguity analysis. Because deeming a word to be ambiguous opens the door to application of the absurd consequences canon, with the less compelling showing it requires, doing so too liberally risks allowing future courts to inject policy views into statutes where their meaning should be controlled by their plain terms. Here, the term "hearing officer" as used in the UPWA is, under our traditional rules of statutory construction, so clearly. unambiguous that to deem it otherwise creates such a risk,
¶50 In the case before us, both the absurd consequences canon and the absurdity doe-trine are satisfied, so our disagreement with the lead opinion on whether "hearing officer" is ambiguous is of no consequence. , But in other cases the questlon of whether a statute is ambiguous, and therefore whether the absurd consequences canon or the absurdity doctrine applies, may be determinative. So it is critical that we carefully distinguish between the two doctrines. For this reason, although we reach the same result as the lead opinion on this question, we deem the term "hearing officer" to unambiguously not include district court judges, but under the absurdity doctrine, we nevertheless reform the statute to include them. tes
A. The Legislature Did Not Intend "Hearing Officer" to Mean District Court Judge
¶51 To withhold earned wages under subsection 5(c), an employer must "present[ ] evidence" to "a hearing officer or an administrative law judge" that "would warrant an offset."[25] In concluding that the term "hearing officer" is ambiguous, the lead opinion begins by noting that we "regularly refer to judges as Judicial officers'" and that "a typical responsibility of such an officer is to preside over hearings."[26] While conceding that district court judge "is not the most 'common use of the term 'hearing officer" and that the term has taken on specialized meaning in the context of administrative law, the lead opinion nevertheless concludes that "the legislature must have employed" this "broader sense" of the term to "encompass[ ] district court judges,"[27] because holding otherwise would effectively "render subsection 5(c) void for claims of $10,000 or more."[28]
152 As we have discussed, the absurd consequences canon is intended to operate as a tie-breaker when a statute's plain text lends itself to two plausible alternative readings.[29] That is not the case here, be *1003 cause the term "hearing officer" in the UPWA does not lend itself to two plausible interpretations. When interpreting a statute, our primary goal is to ascertain the intent of the legislature.[30] And in performing that task, we first consult the "ordinary, and commonly understood meaning"[31] of the statute's terms, often referring to dictionary definitions.[32] But when the legislature "borrows terms of art"[33] that have accumulated a specialized, technical meaning, we "explain them by reference to the art or science to which they [are] appropriate."[34] Normally, when these sources show "the language of a statute is clear and unambiguous, our analysis ends; our duty is to give effect to that plain meaning."[35] Here, however, the lead opinion determines that the term "hearing officer" is ambiguous even though its proffered alternative reading finds no support in either the ordinary meaning of the term or the specialized meaning it has acquired in the context of administrative law.
158 With respect to ordinary meaning, dictionary definitions of "hearing officer" do not include "district court judge."[36] Black's Law Dictionary offers two definitions for the term "hearing officer." The one listed first is "administrative-law judge."[37] The second s "[a] person, usulally] an attorney, who serves in an appointive capacity at the pleasure of an appointing judge, and whose actions and decisions are reviewed by that judge."[38] Because a district court judge is not an "administrative-law judge" and does not "serve[ ] in an appointive capacity at the pleasure of an appointing judge," a district court judge does not fall within the dictionary definition of "hearing officer."[39]
T54 The term "hearing officer" has also acquired specialized meaning in the context of administrative law, and that technical definition does not encompass district court judges either. When the legislature employs technical terms that have accumulated specialized meaning in a particular field, we presume it "knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."[40] The term "hearing officer" has a well-accepted meaning in the administrative-law context and is consistently used by the legislature to mean an officer within an agency. For example, the Utah health code,[41] the state system of public education *1004 code,[42] the insurance code,[43] and the municipal code [44] all provide instances where the applicable agency or governing board appoints or selects a "hearing officer" to take evidence, make preliminary findings, or hear grievances. In each of these cases, there is no argument that "hearing officer" was intended to be used interchangeably with "district court judge." And we are unaware of any statutes that employ the term "hearing officer" to mean district court judge.
¶55 Instead of grounding its interpretation of "hearing officer" in either the plain meaning or specialized use of that term, the lead opinion cites a number of cases dealing with probation revocation proceedings and concludes that it is "not unheard of ... to use the terminology of 'hearing officer" to encompass "district judges." [45] And the lead opinion argues that in a number of prior cases, we "have used" the term hearing officer "in a manner implicitly encompassing district judges."[46] Reliance on these cases is misplaced for two reasons: (1) they tell us little about what the legislature intended when it drafted the UPWA, and (2) the lead opinion over reads the scope of our holdings in those cases.
156 In State v. Orr,[47] we applied U.S. Supreme Court precedent to the question of whether a district court can properly extend a defendant's probation if the defendant "did not receive notice that the State intended to extend [the defendant's] probation until after his probation was set to expire."[48] In holding that a district court could extend probation under such cireamstances, we applied Gagnon v. Scarpelli,[49] which provides that one of the "minimum requirements" of due process to which a probationer is entitled is "'the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation). "[50] The lead opinion focuses on our use of the term "hearing officer" and concludes that we implicitly characterized district court judges as hearing officers in Orr and four other decisions addressing the same issue."[51]
157 First, even accepting the lead opinion's reading of these cases, the central focus of our inquiry in the case at hand is not what this court has meant in using the term "hearing officer" in the context of eriminal procedure. It is what the legislature intended when it used that term in the UPWA.[52] And we cannot accept that the legislature looked past the dictionary definition of the term and its well-accepted technical meaning in order to codify a more obscure understanding of "hearing officer" that, as we explain below, we at best tacitly acknowledged in the context of probation revocation proceedings.
158 Second, the lead opinion over reads these cases. It argues that we "used the terminology of 'hearing officer in a manner implicitly encompassing district judges,"[53] but a closer reading of each case forecloses even that conclusion. Some states, like Utah and Missouri, hold revocation proceedings *1005 primarily in district court.[54] But others, like Wisconsin and Towa, hold probation revocation proceedings before an agency.[55] The Supreme Court in Gagnon used the term "hearing officer" because that case involved an appeal from an administrative probation revocation proceeding in Wisconsin,[56] and it quoted language from Morrissey v. Brewer, an administrative probation revocation case from Iowa.[57] But when deciding whether a probationer from Missouri had been afforded due process in his revocation hearing before a state court, the Supreme Court used the word "judge."[58] And tellingly, the only use of the term "hearing officer" in any of the Utah cases the lead opinion cites appears in direct quotes from Gagnon; we refer to judges as "trial court," "court," "district court," and "district judge" elsewhere in those decisions.
T59 By quoting the U.S. Supreme Court's precedent characterizing administrative officials from Iowa and Wisconsin who preside over probation revocation proceedings as "hearing officers," we may have tacitly acknowledged that some states employ judges and other states employ agency officials to perform the same task in this narrow context. But we did not analyze the plain meaning of "hearing officer" in any of those cases, nor did we decide what that term meant in the context of administrative law. So this line of cases has little to say about how we should interpret the legislature's use of that term in the UPWA.
1 60 In sum, neither the ordinary nor the technical meaning of the term "hearing officer" plausibly includes district court judges. Rather, all the relevant sources-dictionary definitions, specialized use, and definitions of that term in other administrative law statutes-indicate that the term meéans a person appointed by an administrative law judge to conduct investigations, process claims, hold hearings, and assess penalties. Therefore, the lead opinion errs in relying upon the absurd consequences canon because the term "hearing officer" unambiguously does not include district court judge. So although, as we explain below, we agree that this reading of the statute leads to absurd results, we decline to adopt the lead opinion's reasoning, because we believe doing so risks allowing future courts to inject policy considerations into an analysis that should be focused exelu-sively on the terms of the statute.
B. Failing to Read "Hearing Officer" to Include "District Court Judge" Leads to Absurd Results
161 Although we disagree with the lead opinion's interpretive approach, we understand, and indeed we share, its motivation. As the lead opinion points out, an employee can bring a withholding claim under $10,000 before the Commission or a district court, and claims exceeding that threshold may only be brought in district court. But there is no clear procedural mechanism outlined in the statute or the Commission's regulations directing employers as to how they may secure "the opinion" of a "hearing officer" to sanction a withholding. The result is patently absurd: a district court can hear any wage claim, but only the Commission ean approve a withholding, even though the Commission lacks jurisdiction to even hear wage claims that exeeed $10,000. In effect, then, the statute gives employers an opportunity to withhold as to small counterclaims but denies them that same opportunity for claims employers are most likely to pursue-large counterclaims that exeeed the $10,000 threshold.
*1006 162 We can think of no reason why withholding claims should be treated this way, and the parties have not offered one. But rather than attempt to justify a conclusion that "district court judge" is a permissi-bie construction of "hearing officer," we conclude that this was an oversight on the part of the legislature. No reasonable legislator could have intended this inequitable, overwhelmingly absurd result, "Normally, where the language of a statute is clear and unambiguous, our analysis ends; our duty is to give effect to that plain meaning."[59] But under the absurdity doctrine, "a court should not follow the literal language of a statute if its plain meaning works an absurd result."[60] As we have noted, we do not often employ this canon, with its required compelling showing, because doing so runs the risk of substituting "our views of good policy for that of the legislature."[61] 'For this canon to apply, then, the plain language must lead to a result so overwhelmingly absurd that no reasonable legislator could have intended it.[62]
163 That standard is met in this case. The plain, unambiguous, operation of the statutory language treats employers differently based on the size of an employee's wage claim and the forum in which the employee chooses to pursue it. And neither the statute, the regulations, the trial court's ruling, nor Mr. Utley advances any justification for such, an inequity. Because we cannot believe any rational legislator could have intended to treat withholding claims in this manner, we reform the statute under the absurdity doctrine to read hearing officer, administrative law judge, or district. court judge and thereby permit district court judges the same authority, as hearing officers to approve a withholding made under subsection 5(c). We therefore reach the same result as the lead opinion, but base that result on a rationale we consider more consistent with our traditional principles of statutory construction. '
II. The UPWA Does Not Allow for Preemptive Withholdings
T 64 Even though I ultimately spree with a majority of the Court that district court judges should be able to approve a withholding under subsection 5(c), I cannot agree with the majority's conclusion allowing employers to preemptively withhold earned wages so long as they. convinee a court to sanction the withholding after the fact. This is not a dispute about whether Mr. Utley earned the wages at issue. Mill Man concedes that he earned the commissions he claims. Rather, it is a dispute over who will hold these wages during the pendency of Mill Man's counterclaim. May Mill Man hold them as a lien securing a potential judgment on its counterclaim, or may 'Mr. Utley hold them subject to ultimately disgorging them if Mill Man prevails on its counterclaim? The majority permits Mill Man to retain Mr. Utley's wages despite the fact that the statute presumes that wages earned by an employee will be promptly paid unless an employer satisfies its burden of demonstrating the application of an exception.
T65 In permitting the employer to preemptively withhold wages without making any showing whatsoever, the majority turns the essential purpose of the statute 'on its head. Rather than shifting the financial risk of wage withholding to employers by requiring them to' establish an exception before withholding, the majority's reading of the statute allows the employer to withhold wages that have admittedly been earned pending the resolution of the employer's counterclaim.
N66 I believe reading the statute in this manner is inconsistent with its plain terms, our interpretive canons, and the central concern animating the UPWA. And it also confers powerful settlement leverage on the employer. In my view, this is not what the legislature intended. Because Mill Man failed to present evidence before an administrative law judge, a hearing officer, or a *1007 district court judge prior to withholding Mr. Utley's wages, I would affirm the district court's summary judgment in Mr. Utley’s favor,.
T67 To begin, the plain language and structure of the statute strongly suggest subsection 5(c) does not permit preemptive with-holdings. Under that subsection, an employer cannot withhold wages "unless ... the employer presents evidence that in the opinion of a hearing officer or administrative law judge would warrant an offset."[63] By using the term "unless," the statute conditions the employer's ability to withhold on the presentation of evidence.[64] "The word =unless' is a subordinating conjunction in common usage, connecting a dependent or subordinate clause of a sentence with the main or primary clause."[65] - Here, the subordinate clause, or condition, is the employer's presentation of evidence, and "[uJnless the condition [is] met, there can be no [with-holding]."[66] In my view, this term requires an employer to present evidence before it withholds wages, not after, -
168 I recognize that the term "unless" does not denote a temporal restriction as clearly as other terms, such as "until"[67] or "before."[68] Unlike the term "hearing officer," it is genuinely ambiguous. That said, any ambiguity in the statute is resolved by applying basic principles of statutory construction. When interpreting a statute, we do not read the ordinary meaning of its terms in isolation; rather, we "determine the meaning of the text given the relevant context of.the statute," including "the structure' and language of the statutory scheme."[69] We also look to the terms surrounding an ambiguous provision to see if they share " common feature from which we may extrapolate meaning."[70]
T 69 These principles of statutory construction clarify any ambiguity in the term "unless." As used in subsection 5(c), it means "before." Moreover, the context and structure of the statute also foreclose the majority's reading allowing preemptive withhold-ings. The statute's. central purpose is,. to require employers to promptly pay wages unless they can justify nonpayment.[71] It establishes a general rile requiring prompt payment of. earned wages in regular intervals and within twenty-four hours of termination.[72] The statute also provides a remedy *1008 to employees who haven't been paid,[73] and it imposes civil and criminal penalties on employers who fail to comply.[74] If an employer wishes to withhold wages that have been earned, it has the burden of establishing an exception to the statute's general presumption that employees should be promptly paid.
I 70 There are four exceptions to the statutory presumption of prompt payment that allow an employer to withhold admittedly earned wages, and three of them unambiguously permit a withholding only if the employer receives some form of authorization before the withholding takes place. For example, an employer may withhold wages (1) under an express agreement from the employee; (2) under federal or state legal requirements, or a court order;[75] or (8) "as a contribution of the employee" to an established 401k plan.[76] The remaining exception is of course the one at issue here-it allows a withholding if "the employer presents evi-denee that in the opinion of a hearing officer or an administrative law judge would warrant an offset."[77]
T71 Under the canon of noscitur a soccis (it is known for its associates),[78] if several terms in a list share a common attribute, we interpret other terms in the list in accordance with that common feature.[79] Because the withholding exceptions listed before and after subsection 5(c) all "share[] the same attribute" of being set or agreed to before a withholding takes place, the structure of subsection 5 is strong evidence of a legislative intent that an employer must also present evidence before withholding earned wages under subsection 5(c).
T 72 This reading is also supported by the canon of consistent usage, which provides that "where a word has a clear and definite meaning when used in one part of ... a document, but not when used in another, the presumption is that the word is intended to have the same meaning in the latter as in the former." [80] We recently relied on this canon to interpret the term "management" in the Utah Governmental Immunity Act.[81] In Barneck v. Utah Department of Transportation, we were asked to determine whether the phrase "management of flood waters" in the Act was limited to "the physical function of actively control{ling] and direct[ing] the flood waters themselves" or also encompassed the decision to leave flood waters undisturbed.[82] We held that the broader definition applied, relying on the canon of consistent usage.[83] We observed that the term management appeared in a series-"the management of flood waters, earthquakes, or natural disasters"-and the "only way that government can manage those phenomena is in the broad sense" of deciding how best to respond to them; after all, "[ojne cannot control or direct an earthquake or a tornado."[84] And "under the canon of consistent usage," we *1009 concluded, "management cannot properly mean one thing as applied to two of the objects in a series (earthquakes and natural disasters) but something else as applied to the other object in the same series (flood waters)" [85]
173 The majority's reading of subsection 5(c) is inconsistent with this canon. This is made clear when subsection 5 is viewed in its entirety: ' |
(5) An employer may not withhold or divert part of an employee's wages unless:
(a) the employer is required to withhold or divert the wages by:
(i) court order; or
(8) state or federal law;
(b) the employee,expi'ess1y authorizes the deduction in writing;
(c) the employer presents evidence that in the opinion of a hearing officer or an administrative law judge would warrant an offset; or
(d) subject to Subsection (7), the employer withholds or diverts the wages [for contributions toward qualified retirement plans][86]
The majority acknowledges that the term "unless" is "sometimes temporal" [87] and that "the other subsection 5 exceptions appear to be formulated in terms that may be satisfied before an employer's withholding."[88] But the word "unless" is used just once in subsection 5. It is not even repeated before each exception. To me, this is the canon of consistent usage squared. It would be odd indeed for the legislature to intend a single word to have a different meaning as applied to subsection (c) than it has as applied to subsections (a), (b), and (d). Yet by allowing employers to preemptively withhold wages and then "present. evidence" warranting an offset, that is precisely what the majority does. Its reading is therefore inconsistent with our application of the canon of consistent usage in Barneck; the same word cannot be a temporal limitation for some elements in a list but merely conditional for others.[89]
'I 74 In summary, the Act's central purpose is to assure that employees receive prompt payment of earned wages, and three of the specific withholding exceptions clearly must be satisfied before wages are withheld. These features of the statute, in my view, clarify any ambiguity resulting from the legislature's use of the term "unless" in subsection 5(c). If an employer wants to withhold earned wages under that exception, it must first present evidence to a hearing officer, an administrative law judge, or a district court judge. Here, Mill Man withheld the entirety of Mr. Utley's commissions before presenting any evidence of its offsetting claims. And it admits that "assuming that there were no other issues or defenses between Mill Man and [Mr.] Utley, [Mr.] Utley would have been entitled to payment of additional commissions in the sum of [$]1100,479.99." Having failed to present evidence to an administrative law judge, a hearing officer, or a district court judge that would warrant an offset before making its withholding, Mill Man's withholding was, in my view, improper.
75 The majority acknowledges that it is plausible to interpret the statute in this way, but it rejects my reading based on a concern that such an interpretation renders subsecetion 5(c) a dead letter. It reasons that because the UPWA requires an employer to pay wages within twenty-four hours of an employee's termination, requiring employers to present evidence supporting a withholding before retaining the employee's wages is a *1010 practical impossibility.[90] An employer would be "hard-pressed," it concludes, to secure even the "entry of a stay or a temporary restraining order" within such a "narrow timeframe."[91] The majority's reading of the statute is deficient in a number of respects.
T76 First, it leads to the absurd result of requiring an employer to risk eriminal liability in order to pursue a good-faith counter'claim. Section 84-28-12 provides that "[alny employer who shall violaté, or fail to comply with any of the provisions of this chapter shall be guilty of a misdemeanor."[92] This language makes no exception for good-faith counterclaims that the employer is later unable to prove in court: So under the majority's reading, any employer who withholds wages based on a good-faith counterclaim against the employee is guilty of a crime the moment a court rules in the employee's favor. This would be true even in a close case where the employee satisfies the preponderance of the evidence standard only by the narrowest of margins.[93]
T77 Certainly the legislature did not intend a statutory regime where an employer is, as a matter of practical impossibility, precluded from withholding wages without risking criminal liability. I know of no example in. our caselaw or statutes where losing a civil claim, including those brought in good faith, can result in eriminal liability, In my mind, to read the statute in this way presents an absurdity every bit as great as the one that the majority and I agree mandates the inclusion of district court judge in subsection 5(c).[94] _.
T78 Second, there is a more straight-forward way to read subsection 5(c) so that it remains a viable exception while avoiding this absurd result. I acknowledge that the twenty-four-hour period is problematic if we read the statute to require a full-fledged decision on the merits after an evidentiary hearing.[95] But the question under subsection 5(c) is not the underlying merits of the employer's counterclaim. - Rather, it is which party retains admittedly earned wages during the adjudication of such a claim.
179 In my view, this is why the language in subsection 5(c) is phrased conditionally. The employer's burden to justify a withholding is not to prevail on the merits. It is to present[ ] evidence that ... would warrant an offset.[96] I believe the conditional language, coupled with the short timeframe in which an employer must satisfy its burden, indicates a legislative intent to require only a threshold showing or proffer of evidence that, if proven, warrants an offset-not a full-blown evidentiary hearing and a judgment on the underlying merits. |
180 As a practical matter, employers will likely have all or most of this evidence on hand when an employee is terminated. After all, the employer controls the timing the termination. And before making the decision to terminate an employee, an employer has presumably accumulated and analyzed the evidence it believes justifies this decision. Further, our district court judges are regularly available to hear urgent matters on short notice. For these reasons, while it may be difficult for employers to make their *1011 proffer of evidence within the twenty-four-hour window, it is not the near impossible task suggested by the majority. And it would certainly not be inconsistent with the terms of the UPWA to then allow the administrative law judge, hearing officer, or district court judge a reasonable time in which to make a preliminary finding on whether the proffered evidence, if proven, would warrant an offset.[97]
{81 Moreover, in any case where an employer cannot timely make its proffer of evidence in the ordinary course, other mechanisms are available to it. For example, an employer could seek a temporary restraining order or a preliminary injunction under rule 65A of the Utah Rules of Civil Procedure.[98] Ex parte motions for emergency relief are also routinely decided within a day, but even if the proceedings take more time, the employer could couple the motion for emergency relief with a motion to stay any monetary or criminal penalties pending consideration of the evidence.[99]
1 82 For these reasons, I do not believe the twenty-four-hour-payment requirement mandates the majority's reading of subsection bic). And I am convinced that its interpretation of that subsection, which allows preemptive withholdings and precludes an employer from asserting even a good-faith counterclaim without risking eriminal liability, is inconsistent with the central purpose of the UWPA-to ensure the prompt payment of earned wages."[100] And to me it is more than a little fronic that the majority uses the twenty-four-hour-payment requirement, <a provision that highlights the urgency the legislature placed on the prompt payment of wages, as justification for allowing the employer to withhold earned wages during the full pendency of its cofnterclaim.
*1012 183 In sum, authorizing an employer to make unilateral, preemptive withholding decisions inverts the central purpose of the statute. Instead of shifting the financial risk of a wage dispute to employers, the majority's reading effectively gives employers a lien on any unpaid, but earned, wages to secure a counterclaim. This gives employers powerful settlement leverage in a relationship where they already enjoy unequal bargaining power. Perpetuating this imbalance frustrates the basic purpose of the statute, and I do not believe the legislature intended such a consequence.
¶84 For these reasons, I respectfully dissent. Although I agree with the majority that district court judges should be able to approve a withholding under subsection 5(c), I would hold that the district court properly granted summary judgment because Mill Man did not present evidence before withholding Mr. Utley's wages.

. See State v. Redd, 1999 UT 108, ¶ 12, 992 P.2d 986 ("Where we are faced with two alternative readings, and we have no reliable sources that clearly fix the legislative purpose,... we interpret [the] statute to avoid absurd . consequences.")

. See Cox v. Laycock, 2015 UT 20, ¶¶ 71-73, 345 P.3d 689 (Lee, J., concurring) (noting that under "the doctrine of absurdity," we depart from the plain language of a statute if interpreting the text as written leads to a result "so overwhelmingly absurd that no rational legislator could ever be deemed to have supported a literal application of its text"). >

. See Encon Utah, LLC v. Fluor Ames Kraemer, LLC, 2009 UT 7, ¶ 73, 210 P.3d 263 ('When statutory language plausibly presents the court with two alternative readings, we prefer the reading that avoids absurd results." (internal quotation marks omitted)).

. Id.

. See State ex rel. Z.C., 2007 UT 54, ¶¶ 11-13, 165 P.3d 1206; see also Cox, 2015 UT 20, ¶ 71, 345 P.3d 689 (Lee, J., concurring).

. Encon Utah, LLC, 2009 UT 7, ¶ 73, 210 P.3d 263, (internal quotation marks omitted); see also Cox, 2015 UT 20, ¶ 71, 345 P.3d 689 (Lee, J., concurring).

. State ex rel. Z.C., 2007 UT 54, ¶ 15 n. 5, 165 P.3d 1206.

. Cox, 2015 UT 20, ¶ 71, 345 P.3d 689 (Lee, J., concurring).

. State ex rel. Z.C., 2007 UT 54, ¶ 15 n. 5, 165 P.3d 1206 (noting that the absurd consequences doctrine "does not necessitate the same level of caution" as the absurdity doctrine).

. See id. ¶ 12; see also Marion Energy, Inc. v. KFJ Ranch P'ship, 2011 UT 50, ¶¶ 69-70, 267 P.3d 863 (Lee, J., dissenting) (discussing the differences between the absurd consequences canon and the absurdity doctrine).

. Copm § 34-28-3(5)(c). The UPWA was amended effective May 2014, but we refer throughout our opinion to the 2013 version of the statute, which is identical to the'version in effect at the time of Mill Man's withholding.

. Supra ¶ 38.

. Supra ¶¶ 39, 42.

. Supra ¶ 40.

. See, e.g., State v. Redd, 1999 UT 108, ¶¶ 12-14, 992 P.2d 986 (interpreting a criminal statute that could be "read in two ways" to avoid consequences the court regarded as "absurd").

. Marion Energy, Inc., 2011 UT 50, ¶ 14, 267 P.3d 863.

. Wasatch County v. Okelberry, 2008 UT 10, ¶ 13, 179 P.3d 768 (internal quotation marks omitted).

. Hi-Country Prop. Rights Grp. v. Emmer, 2013 UT 33, ¶¶ 18-19, 304 P.3d 851.

. Maxfield v. Herbert, 2012 UT 44, ¶ 31, 284 P.3d 647 (internal quotation marks omitted).

. Corning Glass Works v. Brennan, 417 U.S. 188, 201, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (alteration in original) (internal quotation marks omitted); see also Hi-Country Prop. Rights Grp., 2013 UT 33, ¶ 18, 304 P.3d 851 ("Because that term is not expressly defined in the Act, and does not appear to be a technical term of art, we construe it to partake of the ordinary meaning the word would have to a reasonable person familiar with the usage and context of the language in question." (internal quotation marks omitted)). ~

. State ex rel. Z.C., 2007 UT 54, ¶ 11, 165 P.3d 1206.

. See State v. Canton, 2013 UT 44, ¶ 13, 308 P.3d 517 ("In determining the ordinary meaning of nontechnical terms of a statute, our starting point is the dictionary." marks omitted)). (internal quotation

. Buack's Law Dictionary 790 (9th ed,2009).

. Id. (referring to the third definition of "judicial officer" as another definition for hearing officer) id. at 1193 (defining "judicial officer" as [al person, usu. an attorney, who serves in an appointive capacity at the pleasure of an appointing judge, and whose actions and decisions are ~ reviewed by that judge").

. Webster's Third New International Dictionary provides a similar definition, referring to an individual in appointed or reviewable capacity that is empowered to investigate, commence claims, make findings, and make recommendations to the agency. Wessrer's THirp New InterNationat Dictionary 1044 (1961).

. Maxfield, 2012 UT 44, ¶ 31, 284 P.3d 647 (internal quotation marks omitted).

. Urag Cope § 26-8a-407(3) (providing that a "hearing officer" shall preside over formal adjudicative proceedings involving ground ambulance and paramedic licenses).

. Id. § 53¥-6-602(1) (providing that a "hearing officer" may be appointed to conduct a hearing and make recommendations concerning findings).

. Id. § 31A-2-301(1) (providing that the Commissioner of Insurance may appoint a "hearing officer" to assist in proceedings before the Commissioner).

. Id. § 10-3-1106(2)(a) (providing that municipal employees may appeal a final decision to discharge to a "hearing officer").

. See supra ¶ 38.

. Supra ¶ 37 n. 11.

. 2005 UT 92, 127 P.3d 1213.

. Id. ¶ 10.

. 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

. Orr, 2005 UT 92, ¶ 20, 127 P.3d 1213 (emphasis added) (quoting Gagnon, 411 U.S. at 786, 93 S.Ct. 1756).

. Supra ¶¶ 37-38 & n. 11; see Morishita v. Morris, 621 P.2d 691, 694 (Utah 1980) (Wilkins, J., dissenting); State v. Tate, 1999 UT App 302, ¶¶ 10-12, 989 P.2d 73; Layton City v. Peronek, 803 P.2d 1294, 1299 (Utah Ct.App.1990); State v. Hodges, 798 P.2d 270, 273 (Utah Ct.App.1990).

. See Marion Energy, Inc., 2011 UT 50, ¶ 14, 267 P.3d 863.

. See supra ¶ 38 n. 12.

. See Morishita, 621 P.2d at 692-93; see also MO. REV. STAT. § 559.036 (2015).

. See State ex rel. Vanderbeke v. Endicott, 210 Wis.2d 502, 563 N.W.2d 883, 889 (1997); see also IOWA CODE § 908.4(1) (2015) (''The parole revocation hearing shall be conducted by an administrative parole judge who is an attorney.").

. See Gagnon, 411 U.S. at 779, 786, 93 S.Ct. 1756.

. Id. at 786, 93 S.Ct. 1756 (quoting Morrissey, 408 U.S. at 489, 92 S.Ct. 2593).

. See Black v. Romano, 471 U.S. 606, 615-16, 105 S.Ct. 2254, 85 L.Ed.2d 636 (1985) (explaining that the "decision to revoke" a Missouri defendant's "probation satisfied the requirements of due process" because "he had a full opportunity to present mitigating factors to the sentencing judge and to propose alternatives to incarceration").

. State ex rel. Z.C., 2007 UT 54, ¶ 11, 165 P.3d 1206.

. - Id. (internal quotation marks omitted).

. Cox, 2015 UT 20, ¶ 71, 345 P.3d 689 (Lee, J., concurring).

. State ex rel. Z.C., 2007 UT 54, ¶ 13, 165 P.3d 1206.

. Urax Cope § 34-28-3(5)(c) (emphasis added).

. See Wesster's Terp New International Dictio-wary 2503 (1961) (defining "unless" as "except on the condition that,"); American Herimace Dictionary 1402 (1980) (same).

. Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc., 217 Kan. 88, 535 P.2d 419, 423 (1975).

. See Graham v. Wichita Terminal Elevator Co., 115 Kan. 143, 222 P. 89, 90 (1924) (interpreting the term "unless" in a similar context under the Kansas Workmen's Compensation Act).

. Weester's THirp New Internationat Dictionary 2513 (1961) (noting that "until" is "used as a function word after a negative expression to indicate performance or occurrence at a specified time"); American Hertrace Dictionary 1405 (1980) (defining "until" as "[ulp to the time of" and "[blefore a specified time").

. Wresster's Temp New Inrernationat Dictionary 197 (1961) (defining "before" as "preceding (a point, turn, or incident in time)," as well as "preceding (something or someone in a chronological series));" American Heritace Dicttonary 119 (1980) (defining "before" as "in front; ahead; in advance" and "prior to").

. Olsen v. Eagle Mountain City, 2011 UT 10, ¶ 12, 248 P.3d 465.

. Thayer v. Washington Cnty. Sch. Dist., 2012 UT 31, ¶ 15, 285 P.3d 1142.

. See, eg., Urax Cope § 34-28-3(6) ("An employer may not require an employee to rebate, refund, offset, or return a part of the wage, salary, or compensation to be paid to the employee except as provided in Subsection (5)."); 1d. § 34-28-5(1)(a) (providing that wages for a terminated employee "become due immediately" and must be paid "within 24 hours"); id. § 34-28-5(1)(b)(G) ("In case of failure to pay wages due an employee within 24 hours of written demand, the wages of the employee shall continue from the date of demand until paid, but in no event to exceed 60 days, at the same rate that the employee received at the time of separation."); id. § 34-28-9(2), (3) (imposing monetary penalties on employer's who wrongfully withhold wages); id. § 34-28-12(1) ("Any employer who shall violate, or fail to comply with any of the provisions of this chapter shall be guilty of a misdemeéanor.").

. See id. §§ 34-28-3, -5.

. See id. §§ 34-28-5(1)(b), 34-28-9(1).

. - See id. §§ 34-28-5, 34-28-9(2)-(3), 34-28-12.

. Id. § 34-28-3(5)(a), (b).

. Section 34-28-3(5)(d)(@) allows an employer to withhold wages "as a contribution of the employee under a contract or plan that is: described in Section 401(k) [of the United States Code]." But before receiving 401(k) contributions from employees, an employer must ensure that it establishes a "qualified" 401(k) plan. See Mertens Law Or Frperar Incoms Taxation § 25B:10 (2014). For a plan to be deemed "qualified," the employer must satisfy a series of requirements, including having "a definite, permanent (as distinguished from temporary) plan," "a written document," and a "plan established and maintained by an employer." Id. Accordingly, an employer could not withhold an employee's wages for the purpose of contributing to a 401(k) plan unless the employer had previously established a "qualified" 401(k) plan.

.) Urau Cope § 34-28-3(5)(c).

. Turner v. Staker & Parson Cos., 2012 UT 30, ¶ 10 n. 5, 284 P.3d 600.

. See Thayer, 2012 UT 31, ¶ 15, 285 P.3d 1142.

. - Antonin Scatta & Bryan Garner, Reaping Law: THs Interpretation or Lecar Texts 170 (2012) (internal quotation marks omitted).

. Barneck v. UDOT, 2015 UT 50, ¶ 30, 353 P.3d 140.

, Id. ¶31 (alterations in original) (internal quotation marks omitted).

. Id. ¶31.

. Id. (emphasis omitted) (internal quotation marks omitted).

. Id. (internal quotation marks omitted).

. Urax Cope § 34-28-3(5) (emphasis added).

. Supra ¶ 13.

. Supra ¶ 28 (emphasis added).

. The majority interprets the term wea 'unless' ... as merely expressing a condition (without any suggestion as to fiming)," based on "the legal and practical context of the statute's operation." Supra 1/15/2018 10:35:29 PM 14. And it dismisses the fact that "some of the listed objects" in subsection 5 "will usually be satisfied before the withholding" as irrelevant to this conclusion. Supra ¶ 14 n. 4. This artificial narrowing of the meaning of the term "unless" is unwarranted. Here the practical context of the statute cuts in the opposite direction to the one argued by the majority. See supra ¶ 12. As I have discussed, timing is a significant component of the other three subsection 5 withholding exceptions, and the central focus of the UPWA is on timing-when and under what conditions wages must be paid. © +

. Supra ¶¶ 13-15.

. Supra ¶ 16,

. Ura § 34-28-12(1).

. The majority concedes that under its reading of the statute, "the potential for criminal liability arises whenever an employer is found to have violated the statute," even when claims are brought in good faith and the employer loses by the narrowest of margins. Supra ¶ 24. To any employers who are understandably leery of pursuing legitimate counterclaims under the specter of potential criminal charges, the majority offers cold comfort-'"the buffer" of "prosecutorial discretion." Supra ¶ 25. We have no way of knowing whether a prosecutor "would presumably be inclined to withhold criminal charges" when an employer loses a good-faith counterclaim. See supra ¶ 25. And in my view, an employer's ability to pursue legitimate withholding claims against an employee should not depend on the good graces of whoever happens to reside in the district attorney's office when the claim arises. I believe the far better answer to the conundrum presented by the statute's imposition of criminal liability for the failure of even good-faith counterclaims is that the legislature intended the employer to make its proffer before withholding.

. See supra ¶¶ 37-42, 61-63.

. See supra ¶¶ 14-16.

. Urag Cope § 34-28-3(5)(c) (emphasis added).

. The majority argues that requiring a preliminary proffer of evidence justifying the withholding is not compatible with the procedural mechanisms prescribed in our rules of civil procedure, ' supra ¶ 17, and it maintains that reading the statute in this way would "develop{] a new procedural mechanism" that "alter[s]) our civil, rules" without the two-thirds majority vote in both houses of the legislature that our constitu' tion requires. Supra ¶ 17.
Reading the statute to require a preliminary showing does not create a novel procedural mechanism or a new procedural rule. In subsection 5(c); the legislature sets forth a substantive rule controlling when an employer may withhold wages and, by using conditional language suggestive of a proffer ("presents evidence that in the opinion of a hearing officer ... would warrant an offset"), indicates an evidentiary standard. See Uraw Cope § 34-28-3(3)(c) (emphasis added). There is nothing new or novel about a hearing to determine whether an eviden-tiary standard has been met.

. Uran R. Civ. P. 65¥(e)(4).

. These procedural mechanisms are not "imag-in[ed]" "heroic," or "practically unavailable." See supra ¶¶ 17, 20, 22. The majority's argument dismissing them hinges, in large part, on its insistence' that the subsection 5(c) evidentiary threshold requires "a merits-based 'opinion' on the legal viability of an offset." Supra ¶21. I agree that such a ruling "could hardly be entered on an ex parte basis," supra ¶21, but in other contexts, courts routinely accord temporary relief during ex parte proceedings. See, eg., Urax Cope § 78B-7-106(1) (authorizing courts to enter ex parte protective orders to protect a petitioner from domestic abuse); id. § 78B7-202 (providing the same relief for victims of child abuse); id. § 38-9a-202 (authorizing courts to issue ex parte civil wrongful lien injunctions); id. § 77-3a-101 (allowing courts to issue ex parte civil stalking injunctions). And in any event, I have identified these procedural mechanisms as fall backs an employer might use if they are unable to make a preliminary showing within twenty-four hours. As I have explained, I see no reason why we cannot read subsection 5(c) as providing an employer a mechanism to obtain a preliminary remedy that allows it to retain wages subject to disgorging them later if its underlying counterclaim fails.

. - The majority rejects this argument because it finds "no basis for concluding that this was the legislature's only purpose, or that it sought to vindicate this 'central purpose' at the expense of all other concerns."" Supra ¶33. And it maintains that another purpose recognized in the statute's text is to protect ""the employer's interest in withholding wages under the exceptions set forth in [subJsection 5." Supra ¶ 34. .I agree with the majority that statutory language is often "the result of a legislative give-and-take that balances multiple concerns," supra ¶ 34 (internal quotation marks omitted), and that subsection 5 recognizes employers' interests in withholding wages. But that does not tell us much about whether subsection 5(c) allows preemptive withholdings. After all, requiring employers to seek approval before they withhold wages accommodates both of these interests; employees receive prompt payment of earned wages, and employers can pursue legitimate counterclaims without facing - criminal liability.